IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 10, 2010 Session

## STATE OF TENNESSEE v.
## DANITA LANETTE WILSON and TIFFANY NICOLE NORMAN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-C-2551      J. Randall Wyatt, Jr., Judge**

_____

**No. M2008-02850-CCA-R3-CD - Filed December 19, 2011**

_____

Following a jury trial, Defendant Danita Lanette Wilson was convicted of two counts of aggravated child neglect (counts one and two), conspiracy to possess a Schedule II controlled substance with intent to sell (count three), possession of .5 grams or more of cocaine with intent to sell (counts four and eight), attempted aggravated child neglect (count six), reckless endangerment (count seven), tampering with evidence (count nine), resisting arrest (count ten), and possession of drug paraphernalia (count eleven). The trial court merged the two convictions for aggravated child neglect into a single count, referred to as "count one." The trial court sentenced Defendant Wilson to seventeen years for aggravated child neglect (count one); five years for conspiracy to possess a Schedule II controlled substance with intent to sell (count three); ten years for each conviction of possession of .5 grams or more of cocaine with intent to sell (counts four and eight); ten years for attempted aggravated child neglect (count six); eleven months, twenty-nine days for reckless endangerment (count seven); five years for tampering with evidence (count nine); six months for resisting arrest (count ten); and eleven months, twenty-nine days for possession of drug paraphernalia (count eleven). The trial court further ordered that Defendant Wilson's seventeen-year sentence in count one, her ten-year sentence in count four, and her ten-year sentence in count six be served consecutively for an effective thirty-seven-year sentence. The jury convicted Defendant Tiffany Nicole Norman of two counts of child neglect (counts one and two), facilitation of conspiracy to possess a Schedule II controlled substance with intent to sell (count three), facilitation to possess .5 grams or more of cocaine with intent to sell (count four), possession of drug paraphernalia (count five), and two counts of attempted aggravated child neglect (counts six and seven). The trial court also merged Defendant Norman's convictions for child neglect into a single count, referred to as "count one." The trial court sentenced Defendant Norman to four years for child neglect (count one); six years for facilitation of conspiracy to possess a Schedule II controlled substance with intent to sell (count three); nine years for facilitation to possess .5 grams or more of cocaine with intent to sell (count four); eleven months, twenty-nine days for possession of drug paraphernalia (count five); ten years

for each conviction of attempted aggravated child neglect (counts six and seven).  The trial court further ordered that Defendant Norman's four-year sentence in count one, her nine-year sentence in count four, and her ten-year sentence in count six be served consecutively for an effective twenty-three-year sentence.

On appeal, Defendants both argue that (1) the trial court erred in denying their motions to sever offenses and defendants; (2) the counts of indictments charging them with aggravated child neglect and attempted aggravated child neglect are defective; (3) the trial court erred in allowing Dr. Donna Seger to testify as an expert witness as to the time frame in which Nehemiah Stallings ingested the drugs; and (4) the evidence was insufficient to support the convictions. Defendant Norman additionally argues that the trial court erred in allowing the State to refer to her pregnancy at the time of the offenses, that the trial court erred in admitting testimony that she lied during a hospital admissions drug screen, and that the trial court erred is denying her motion to suppress her statements to police.  Defendant Wilson also argues that the trial court erred in denying her motion in limine and admitting a note found on the refrigerator at 28 Shepard Street.  She also asserts that her effective thirty-seven-year sentence is excessive.  After a careful review, we reverse and dismiss Defendant Norman's convictions for child neglect in counts one and two, which were merged by the trial court.  We also remand for entry of a corrected judgment in count eight. Otherwise, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Dismissed as to Counts One and Two Against Defendant Tiffany Nicole Norman; Remanded For Entry of a Corrected Judgment in Count Eight; and In All Other Aspects, the Judgments are Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which ALAN E. GLENN, J., joined.  JAMES CURWOOD WITT, JR., J., concurs in result as to Issue V and joins in the remainder of the opinion.

Michael Colavecchio, Nashville, Tennessee, for the appellant, Danita Lanette Wilson, and Wendy Tucker, Nashville, Tennessee, for the appellant, Tiffany Nicole Norman.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel, Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## Background

The Davidson County Grand Jury in this case originally returned a sixteen-count indictment charging both Defendant Wilson and Defendant Norman with two counts of aggravated child neglect of Nehemiah Stallings (counts one and two), one count of conspiracy to possess a Schedule II controlled substance with intent to sell (count three), possession of .5 grams or more of cocaine with intent to sell (count four), and two counts of attempted aggravated child neglect of Mych'keira Stallings and Antoine Batey (counts six and seven). Defendant Norman was charged with one count of possession of drug paraphernalia (count five). Defendant Wilson was additionally charged with two counts of attempted aggravated child neglect of Cortavius Marable and Nehemiah Stallings (counts eight and nine), three counts of reckless endangerment of Nehemiah Stallings, Cortavion Marable, and Jacarlvis Marable (counts ten through twelve), possession of .5 grams or more of cocaine with intent to sell (count thirteen), tampering with evidence (count fourteen), resisting arrest (count fifteen), and possession of drug paraphernalia (count sixteen). Both Defendants filed a motion to sever the offenses and defendants. The State conceded that counts eight through twelve of the indictment should be severed, and the trial court agreed. The trial court denied the motions as to the remaining counts of the indictment, and they were renumbered for trial purposes. The jury trial resulted in the convictions and sentences set forth above.

### Trial

Around 12:30 a.m. on March 3, 2006, twenty-month-old Nehemiah Stallings was taken to the Emergency Room of Vanderbilt University Medical Center by Defendants Danita Wilson and Tiffany Norman. According to Dr. James Gay, Nehemiah was initially treated by Dr. Don Arnold whose observations indicated:

> When [Nehemiah] arrived at the Emergency Department he was found to be unresponsive, not able to make verbal contact, clenching his teeth, rolling his eyes, having what we refer to as tonic seizure activity, more tense than wildly flinging his arms and not a lot of clonic or a lot of movement to his features, but clearly was in the midst of a seizure.

Because of concerns that a prolonged seizure might affect Nehemiah's ability to breathe, he was given several anti-seizure medications shortly after his arrival in the emergency room. Dr. Gay testified that Nehemiah began having seizures again after he received a CAT scan and was taken back to the emergency room for additional medication. Nehemiah also had evidence of tachycardia. He said that Nehemiah's urine screen was positive for cocaine, ecstasy, and amphetamines. According to Dr. Gay, these drugs caused the seizures.

Dr. Gay also saw Nehemiah on March 4, 2006. He said that Nehemiah did not have normal mental status at that time and that the child would be calm and then have periods of significant agitation. Dr. Gay testified that Nehemiah had to be given doses of Benadryl in order to calm him down so he would not get hurt flinging himself against the crib. He also said that the crib had to have a top because Nehemiah had been able to climb out of the crib and hurl himself against the wall. Dr. Gay saw Nehemiah again on March 5, 2006. The child was better but unable to walk. He said that on March 6, 2006, Nehemiah was having a "normal mental status." Dr. Gay testified that without treatment, "potentially it could have been life threatening and cause an arrest."

Dr. Sheila Dawling, an Associate Professor of Pathology at Vanderbilt and employee of the toxicology laboratory, was qualified as an expert in the field of toxicology. Dr. Dawling testified that she received two urine samples from Nehemiah Stallings. One was taken at 3:00 a.m. and the other was taken at 8:00 a.m. on March 3, 2006. She said that the first test was positive for benzodiazepines, which are used to treat seizures, amphetamine, methamphetamine, MDMA, MDA, and cocaine metabolite. Dr. Dawling explained that MDMA is commonly known as ecstasy, an amphetamine related compound, and MDA is a metabolite of MDMA. She further explained that a "metabolite is something that the body makes out of the parent drug that it ingests." Dr. Dawling testified that Nehemiah would have ingested the cocaine within a span of several hours to several days. However, she felt that it was more likely that he ingested the drug "hours to . . . twelve hours before" his admission. Dr. Dawling testified that the methamphetamine or the ecstasy was ingested, "[o]nly within a very broad time span of, you know, one to two hours. Two, three or four hours." She said that Nehemiah had ingested at least three, "but it could have been as many a five" different substances. Dr. Dawling testified that the results of the second set of tests at 8:00 a.m. were identical to the first set, but the levels were slightly different.

Dr. Donna Seger, Medical Director of the Tennessee Poison Center and an Associate Professor of Medicine and Emergency Medicine at Vanderbilt, was qualified as an expert in the field of Toxicology and Emergency Medicine. She became involved in the present case by looking at and evaluating issues involving the drugs that Nehemiah tested positive for on March 3, 2006. She was also familiar with Dr. Dawlings' findings. Dr. Seger testified that there was a high concentration of cocaine in the first urine sample taken from the victim. She explained that cocaine is a "very strong stimulant," and she would expect for a child's blood pressure and heart rate to rise and for them to "get quite jittery and agitated." She also said that "[t]hey can have seizures go all the way to cardiac arrest." Dr. Seger testified that since the "parent drug" was found in the urine sample, Nehemiah ingested the cocaine "fairly recent." She said, "The metabolite can stay around for days. But the parent drug doesn't." Dr. Seger testified that methamphetamine and ecstasy may cause the same effects on a child as cocaine. She noted: "Each one makes the other one worse. So one plus one plus one

makes ten. So one plus one plus one is ten [sic]. In terms of the potential of those drugs."

Concerning the effects of the drugs on Nehemiah, Dr. Seger testified:

Well, you saw the seizures. I think he was very lucky he didn't have a high enough blood pressure that he bled, had a bleed into his head which would have been something that would have left him permanently [sic]. And you know, it's a very fine line when you start getting level like that as to whether or not it would cause cardiac arrest. And it didn't in him. But I mean, the levels that cause seizures, any time you start seizing with those drugs, your chances of mortality are very high because the seizure itself makes the actions of the drugs worse. You seize and that[ ] makes your body get acid and the acid in your body makes the effect of those drugs worse. It makes them more potent. So death is frequently seen after seizures in many drugs primarily because they're rather toxic. Seizures, in many ways because of the toxicity.

She testified that Nehemiah ingested the drugs within an hour to two hours before he was admitted to the hospital around 12:30 a.m. She did not believe that he ingested the drugs before 7:30 p.m. while he was at the babysitter's. Dr. Seger felt that the drugs were "[m]ost likely from multiple sources" and that he ingested them orally. She testified that hydrocodone would not have accounted for the cocaine or other drugs in Nehemiah's system. Dr. Seger agreed that vomiting and diarrhea could be a symptom of the drugs. She testified that Nehemiah could have died if he had not received medical treatment at Vanderbilt.

Linda Roberts, a social worker at Vanderbilt Medical Center, testified that she was notified of Nehemiah's positive drug screen and obtained the child's history from Defendant Wilson, who said that she was Nehemiah's mother. Defendant Wilson also identified the person with her as her sister, co-defendant Tiffany Norman. Defendant Norman was asleep while Ms. Roberts was interviewing Defendant Wilson. Ms. Roberts testified that Defendant Wilson told her that Nehemiah seemed sick when she picked him up from the babysitter's. She then took him home, fed him some pizza, gave him some Nyquil, and something to drink. Defendant Wilson told her that Nehemiah had diarrhea, and she gave him a bath around 9:30 and put him to bed. Defendant Wilson told Ms. Roberts that shortly after 10:00 p.m., her thirteen-year-old son came in and told her that Nehemiah "appeared to be clenching and his eyes were rolled back in his head. And she became worried and woke up her sister and drove to Vanderbilt because they were unsure of what was going on with him." Ms. Roberts testified that she confronted Defendant Wilson with Nehemiah's positive drug screen, and Defendant Wilson told her that Lashay Elliott had dropped a bottle of hydrocodone in the house, and upon counting it, realized that there were two pills missing. Ms. Roberts testified Defendant Wilson told her that in addition to Lashay Elliott, Defendant

Wilson's sons, Jarcarlvis and Cortavius Marable, lived in the house with her, along with an eighteen-year-old relative. She did not mention if Defendant Norman lived in the home.

Detective Sara Bruner of the Metropolitan Nashville Police Department, Youth Services Division, testified that she and Detective Faye Okert began investigating the case on March 3, 2006, around 1:15 p.m. They first spoke with hospital staff and learned that Nehemiah had tested positive for multiple controlled substances. Then they interviewed Defendant Wilson, Nehemiah's primary caretaker, twice in a conference room near the waiting room, and they also interviewed Defendant Norman twice. The interviews were recorded, and Michael Fornash with the Department of Children's Services (DCS) was also present and participated in some of the interviews. Defendants Wilson and Norman were not under arrest and they were able to talk with each other between interviews. Defendant Wilson said that Nehemiah was her nephew, and his mother was incarcerated. Detective Bruner did not know if Defendant Wilson had legal custody of the child. Defendant Wilson said that Nehemiah was also called "Man-Man," and she cared for him like her own son. Defendant Wilson told detectives that her thirteen-year-old son, Jacarlvis Marable, lived with her, and Defendant Norman had also been staying there. Defendant Norman had a seventeen-year-old son, Cortavius Marable, who lived with his father, but was frequently in her home.

Defendant Wilson said that she, Defendant Norman, and Ashley Hamler, Defendant Wilson's sister, had taken Nehemiah, his sister, Mych'keira Stallings, and Ms. Hamler's children to Barbara Wiggins' house early in the day on March 2, 2006. Ms. Wiggins watched him "[r]oughly from eight or nineish that morning until around sevenish that . . . evening." Concerning Defendant Wilson's version of events, Detective Bruner testified:

> She said that after she [along with her estranged husband, Michael Wilson] had picked Man-Man up from the babysitter's house [around 7:00 to 7:30 p.m.] she brought him home. Well, she stopped and got a pizza for him. And then when they arrived home he ate his pizza. He had two pieces of pizza and drank a drink. And then he started vomiting and - - and had diarrhea. And then after that the - - she cleaned him up. After that sometime the police arrived, were looking for someone. She heard the helicopter above. She said they were looking for someone who had kidnapped somebody. And then she said that a woman was at her home by the name of Quan. And that Quan had run to the back of her home. And then she reported that Quan came back up and said, I had to flush them down the commode. She said she did not know for a fact that - - well, she had no personal knowledge that but she'd been told that Quan has - - sells Ecstasy pills. And then that's what she assumed that she had flushed down the commode when the police had come to her door.

-6-

Detective Bruner testified that Defendant Wilson told her that police were searching for Jewel Hamilton; however, Detective Bruner was unable to find any record of the search or a helicopter being around the residence that day.

Detective Bruner testified that Defendant Wilson told her that Nehemiah later had diarrhea again, and she gave him some "pedialite." She described him as calmer than normal and then "described that later on it - - he must have been rolling." Detective Bruner explained that Defendant Wilson's definition of "rolling" was when "someone is under the influence of ecstasy." Defendant Wilson told Detective Bruner that she put Nehemiah to bed, and her son later brought the victim to her because his teeth were chattering, and his eyes were rolling back in his head. She then woke up Defendant Norman, and they decided to take Nehemiah to the hospital.

Detective Bruner testified that Defendant Wilson began making phone calls when she learned that Nehemiah tested positive for drugs. One of the calls was made to Barbara Wiggins, and Defendant Wilson suggested that Nehemiah may have found some type of drugs at Ms. Wiggins' residence. However, Defendant Wilson said that Ms. Wiggins informed her that it was not possible and that Nehemiah was not sick while in her care. Defendant Wilson told Detective Bruner that Quan Wiggins was at the residence while Nehemiah was eating pizza and that the vomiting and diarrhea occurred before Quan went to the bathroom to flush the ecstasy pills. She called Quan and talked to her about "coming up to the hospital and telling everyone at the hospital what she knew about the situation." However, Quan had prior charges and would not come to the hospital to talk.

Detective Bruner testified that Defendant Wilson was listed as the leaseholder of 28 Shepard Street, Apartment C. She requested Defendant Wilson's permission to search the apartment, and Defendant Wilson signed a consent to search form. Detective Eric Fitzgerald then conducted a search of the home. After the search, Defendant Wilson was interviewed a second time by Detectives Bruner, Okert, and Fitzgerald. Detective Bruner testified that she confronted Defendant Wilson with information obtained from Defendant Norman. She and the other detectives also told Defendant Wilson that she had told a number of lies and made a number of misstatements. Detective Fitzgerald also confronted Defendant Wilson with the fact that four people approached her residence while he was there, knocked on the door, and appeared to be there to purchase drugs. Defendant Wilson indicated that she knew people sold drugs outside her residence, and she had called police to report the activity. However, Detective Bruner was unable to verify that any calls had been made. Detective Bruner testified that Defendant Wilson denied that Quan Wiggins was selling ecstasy from her residence, and she denied using drugs. When Defendant Wilson was confronted with additional information, she admitted to using cocaine and ecstasy and that she had last used the Sunday before Nehemiah was taken to the hospital. She said that she had cleaned the

apartment from "top to bottom" the day before Nehemiah was admitted to the hospital. Defendant Wilson admitted that she had repeatedly lied to investigators.

Defendant Norman told Detective Bruner that she and Defendant Wilson were good friends, and she was at Defendant Wilson's residence on a daily basis. She said that she lost her room at the Roadway Inn at the end of February, 2006 and that she was sleeping at Ms. Wilson's residence on March 2, 2006. She kept her clothes in another person's car. Defendant Norman said that she and Defendant Wilson took Nehemiah and his sister Mych'keira to Ms. Wiggins' home on March 2, 2006, and they later went to get some cleaning supplies. Defendant Norman then watched a friend's child at Defendant Wilson's residence. She said that she saw Quan Wiggins at the apartment that day with a young child. Defendant Wilson told Detective Bruner that she was at home when Nehemiah arrived that evening, and she was awakened when he began vomiting. She was awakened a second time and drove Defendant Wilson and Nehemiah to the hospital. Defendant Norman said that she and Defendant Wilson returned home between 3:00 and 5:00 a.m., after Nehemiah was admitted to the hospital, to get the other children ready for school. She said that Defendant Wilson was called back to the hospital, and they arrived around 6:00 a.m. Defendant Norman initially denied using drugs but later admitted to using cocaine, marijuana, and ecstasy.

Detective Bruner testified that Defendant Norman told her that she was asleep when Nehemiah began having problems and did not have anything to do with his overdose. She also attempted to suggest that Nehemiah's condition began while he was at Barbara Wiggins' home. Detective Bruner testified that Defendant Norman was pregnant at the time of her interviews, and she admitted that she knew it was wrong and harmful to the baby to use drugs while pregnant. Defendant Norman denied that there were any ecstasy pills in Ms. Wilson's home, and she also said that Ms. Wilson told her the story about Quan Wiggins flushing ecstasy pills when police came to the residence; however, she did not see or hear anything. She denied using any drugs at Defendant Wilson's home.

Detective Bruner testified that Defendant Norman later said that she did not think Nehemiah would find drugs in the house because it had been cleaned the day before her interview. During the second interview, Defendant Norman said that Quan Wiggins sold ecstasy pills outside of Defendant Wilson's residence. She also admitted that she had received calls on her cell phone while at Defendant Wilson's residence inquiring if Quan Wiggins was there and available to sell ecstasy pills. Detective Bruner testified that Defendant Norman admitted to using half of an ecstasy pill on February 28, 2006, and she had used cocaine around two weeks before the interview.

Detective Eric Fitzgerald of the Metropolitan-Nashville Police Department, Youth Services Division, testified that he drove to 28 Shepard Street, Apartment C, on March 2, 2006, around 2:45 to 3:00 p.m. to conduct a search. He waited at the residence for

approximately forty-five minutes to one hour for Detectives Bruner and Okert to obtain consent to search and for another unit to arrive. While waiting, Detective Fitzgerald saw at least three individuals walk up to the apartment and "beat" on the door. Based on his training and experience, he testified that the individuals appeared to be drug addicts, and the activity at the residence, which was in a known drug area, was consistent with a drug house. Defendant Wilson's sister, Ashley Hamler, eventually arrived with keys to the residence, and Detective Fitzgerald conducted a search. He said that the apartment was neat, and the only thing that he found was the corner of a plastic baggie in the master bedroom with a white powdery substance. Detective Fitzgerald explained that the bag was "typical packaging of controlled substances, whether it be crack cocaine, marihuana, powdered cocaine." He seized the item but later lost it.

Detective Fitzgerald then drove back to the hospital and participated in an interview of Defendant Wilson. He said that during the interview, she referred to the babysitter's daughter as the "X" lady. Detective Fitzgerald vaguely recalled a conversation with Defendant Wilson about her doing a taped telephone conversation with the "X" lady. However, he was not sure that the call took place.

Barbara Jean Wiggins testified that she had known Defendant Wilson for about eight years, and she had known Defendant Norman for about two or three years. She took care of two children, Nehemiah and Mych'keira, who were living with Defendant Wilson. Ms. Wiggins testified that Nehemiah had been in her care on March 2, 2006, the day before he was taken to the hospital. Ms. Wiggins testified that the two children arrived at her residence by 11:00 a.m., and her nephew's three children were also there. She said that Defendant Wilson and her husband were late picking Nehemiah and Mych'keira up that afternoon and did not arrive until around 7:00 to 7:30 p.m. She received a call from Defendant Wilson the following day indicating that Nehemiah had taken a pill and was in the hospital.

Ms. Wiggins testified that there were no drugs in her home on March 2, 2006. She said that Nehemiah ate that day and did not vomit or have diarrhea while in her care. Ms. Wiggins testified that Nehemiah acted normal, and there was nothing wrong with him when Defendant Wilson and her husband picked him up. Ms. Wiggins testified that Defendant Wilson later asked her to tell police a different story. She said:

> She told me to tell the police that Man-Man was outside in my front yard playing. And the police was chasing some dope man and somebody dropped something in the yard and Man-Man picked it up. I said, because Man-Man ain't pick it up and there's nothing out here. Because we've got security around here.

Ms. Wiggins testified that Quan Wiggins is her daughter, but she was not living with her in March of 2006. She said that Quan's daughter was living with her at the time. Ms. Wiggins testified that Quan Wiggins spent the night at her house on March 1, 2006, but left the following morning.

Sergeant Douglas Thibodeaux testified that in March of 2006, he was working as a detective assigned to the South Precinct Crime Suppression Unit. He worked "street level, mid-level drug cases and [c]riminal [v]ice [a]ctivity and [p]rostitution and so forth." Sergeant Thibodeaux became involved in the present case on March 8, 2006, after learning of the child's overdose, and he had received information from patrol officers. On that date, he used a confidential informant to make a controlled buy at the apartment at 28 Shepard Street. The informant purchased twenty dollars worth of crack cocaine which was packaged in the corner of a plastic baggie that had been cut off. A search warrant was then obtained for the residence and executed on March 14, 2006. Sergeant Thibodeaux testified that when he and other officers entered the apartment, Defendant Norman, Lisa Waters, and Sonya Hendrix were inside the residence. There were also two toddlers there, and Defendant Norman identified one of them as belonging to her. She was sitting on the couch and was later ordered to the floor. Two bags of crack cocaine weighing 17.7 grams were on the floor near her hand. Defendant Norman also had $310 in her purse. Ms. Waters and Ms. Hendrix, who were in a bedroom with children's items, had crack pipes, and a third crack pipe was found in the floor. A marijuana butt was found in a bedroom, and there was a set of electronic scales just underneath the couch. There were also "numerous plastic tear-off baggies tear-offs [sic] lying on the kitchen table." Defendant Norman denied ownership of the drugs.

Sergeant Thibodeaux testified that on April 14, 2006, the South Crime Suppression Unit was conducting a "buy bust operation" in the area of 28 Shepard Street. He said that he and Detective Blazedale were in an unmarked car and attempted to buy crack cocaine from individuals in the area. The two men were driving on Garden Street near John Street and slowed down. A black female identified as Randy[sic] Syler approached the car and asked what they wanted. Sergeant Thibodeaux indicated that he wanted a "15 hard," which is street slang for crack cocaine. Ms. Syler advised them to drive around the block. Sergeant Thibodeaux "turned on to John. John deadends into Shepard and just happens to be right in front of 28 Shepard." He then observed Ms. Syler approach a man later identified as Cortavius Marable, who was standing on the sidewalk in front of 28 Shepard Street. They talked for a moment, and Mr. Marable handed her a piece of folded white paper. Ms. Syler walked over to the unmarked car and exchanged the paper with Detective Blazedale for money.

Sergeant Thibodeaux testified that he and Detective Blazedale drove away and gave

out a description of the parties involved in the drug sale. The takedown units then arrived, and Mr. Marable and Ms. Syler were taken into custody. Another man, Marcus Griffin, who had been talking to Mr. Marable, ran away and was later taken into custody. Ms. Syler had the buy money in her hand and a crack pipe on her person. Mr. Marable, who was seventeen at the time, had two loaded weapons and marijuana on his person.

Sergeant Thibodeaux testified that on July 5, 2006, he met with a confidential informant, and they drove to 28 Shepard Street, Apartment C. He said:

> The [confidential informant] went to the door. The only difference between this and the last time was the person inside whom he identified was a skinny black female. We would not go into the residence. She held the door open and made the transaction while he was standing on the front porch area, and she was inside and handed the drugs [crack cocaine] out to her.

A search warrant was obtained and executed on July 12, 2006. Sergeant Thibodeaux testified that Lisa Waters and Lashay Elliott were at the residence. The police seized a crack pipe from Ms. Water's purse and a note on the refrigerator that read:

> Give Me, Me Befor[e] You Come in  As of Today the 1st of July, 2006, anyone who sells out of my house on my property is paying me $50 daily. [I]f you CAN'T Do That, don't Bring your shit on my property. And that's - that- on- that. After 12 a.m., No More Serving. What I said!!

The note was signed "DA" which was crossed out. Ms. Waters also said that she was selling beer out of the apartment.

Officer Alisha Shoates, who was working for the Hermitage Crime Suppression Unit, testified that she participated in an investigation of 28 Shepard Street because of suspected drug activity. She conducted a controlled buy with a confidential informant at the residence on August 24, 2006. Officer Shoates testified that she drove the informant to the address and watched him get out of the car and walk up to the front door. He then walked around the building to the back door of Apartment C and made a buy. Officer Shoates testified that the informant handed over the crack cocaine and said that he met with a black male at the front door. She then obtained a search warrant for the residence, which was executed on August 25, 2006.

Officer Shoates testified that two individuals, Milford Gandy and she thought Sonya Hendrix, were detained outside. She and other officers entered the residence and found Defendant Wilson and her sister, Ashley Hamler, inside. Cortavius Marable, Defendant Wilson's seventeen-year-old son, was also there. Defendant Wilson attempted to run into

the bathroom, but she was intercepted. Officer Shoates took Defendant Wilson into a bedroom and attempted to search her; however, Defendant Wilson became uncooperative and combative so Officer Shoates placed Defendant Wilson in handcuffs. Defendant Wilson's sister had advised them that Defendant Wilson was pregnant, which they later learned was untrue. Officer Shoates searched Defendant Wilson and eventually found a rock of crack cocaine and money in her bra and four rocks of cocaine in her waistband. Defendant Wilson then became more combative and "totally uncontrollable," and Officer Shoates called additional officers to help her. Defendant Wilson also refused to speak or open her mouth. An ambulance later arrived to pick up Defendant Wilson, and while on the trip to the hospital, she spit out a small baggie with two pink pills inside. Officer Shoates also found a "crack pipe" in the bedroom.

Officer Michael Dixon was also assigned to the Hermitage Crime Suppression Unit in August of 2006 and assisted Officer Shoates in making a controlled buy at 28 Shepard Street, Apartment C, by searching the confidential informant. He also participated in executing the search warrant on August 25, 2006. Officer Dixon testified that he went into the bedroom to help Officer Shoates when Defendant Wilson became combative while being searched. He said:

> I've been working drugs for eight years - - around eight years. And she wasn't moving her mouth, so I thought she had something in her mouth. And she wasn't talking to me. And when she would talk it was more like a grunt. It wasn't. So she wasn't vocalizing with me. She was combative. She was taken to the bed, refused to open her mouth. I mean, I sat on the other side of the bed. But I was really concerned about this at this point, because we really didn't have her under control, and we hadn't searched any bedrooms. And we hadn't searched any bedrooms prior to - - prior to her being searched. And I was concerned about possibly, being weapons or something she could shoot me or herself with. There - - we did discover a gun later on. But she - - we told her several times whatever she had in her mouth spit it out. I wasn't really concerned with that. I was really concerned about her being - - if she was pregnant, I didn't want the baby - - I told her that several times. I dealt with one of the sisters. I think Ashley Hamler. We even called Ashley Hamler in. And said, yeah, talk to her because they had a baby shower. They told us they had a baby shower. Tell her to spit out whatever. And she refused to. We called the fire department and they brought an ambulance. She was combative. Putting her on the gurney she was combative. I even fell down when had [sic] taken outside to the apartment, the residence. I fell down - - I fell over a child's toy. As we were getting on the ambulance she spit out a plastic sandwich baggie. It looked [sic] a plastic sandwich that had a - -

-12-

something pink.  It was a pink pill that it looked like it had been chewed up as we were getting on the ambulance.

Officer Dixon testified that he saw what appeared to be rocks of crack cocaine on the table beside the bed where Officer Shoates had searched Defendant Wilson.

Officer Andrew Indinjaychok testified that he was assigned to the Hermitage Crime Suppression Unit in August of 2006, and he participated in the search of 28 Shepard Street, Apartment C, on August 25, 2006.  He assisted Officer Shoates in searching Defendant Wilson after she became combative.  He saw a white substance coming out of Defendant Wilson's mouth.  After she was taken away in an ambulance, Officer Indinjaychok searched the bedroom and found a loaded .22 Ruger pistol under the bed.

Sergeant Steven Brady was assigned to the Hermitage Crime Suppression Unit, and he coordinated the investigation of the residence at 28 Shepard Street, Apartment C.  He participated in executing the search warrant on August 25, 2006, and supervised the collection of several items.  Sergeant Brady testified that approximately $750, two sets of digital scales, various crack pipes, and a white rock were all recovered from the residence.  Some pills were recovered from Defendant Wilson's mouth.  He testified that scales are commonly used for weighing crack cocaine.

Officer Trainee Genae Cochran, a former case manager with Child Protective Services, testified that she received a referral around 8:30 a.m. on March 14, 2006, and went to 28 Shepard Street, Apartment C.  She said that police officers were already on the scene, and two children were present.  Ms. Cochran spoke with Defendant Norman, and another woman. Defendant Norman said that one of the children, Antoine Batey, who was four years old, belonged to her, and his father had legal custody of him.  She did not give the name of the second child, who appeared to be six to eight months old.  The second child was taken into state custody, and Ms. Cochran later spoke with the child's mother, who was in prison at the time,  and learned the child's name, date of birth, and the father's name.  The child was identified as Mych'keira Stallings.

Ms. Cochran testified that she was aware that Mr. Fornash of DCS was involved in another investigation relating to the events of March 2-3, 2006, and she knew that Defendant Norman was not supposed to have any children in her presence.

Danielle Marsh is employed in medical records at Centennial Hospital.  She testified that Defendant Norman was a patient on March 5, 2006, and Defendant Norman denied using any recreational drugs when she gave her intake information.  However, after being confronted with the results of a drug screen, she admitted to use of the drugs.

-13-

Lisa Waters, who was on probation for a drug offense, testified that she has known Defendant Wilson and Defendant Norman for more than three years, and she lived at 28 Shepard Street in 2006 for a period of three or four months. She also stayed other places while living there. Ms. Waters testified that Defendant Norman lived in the residence, and Ms. Waters observed drug activity at the residence on more than one occasion. She said that Defendant Wilson and Defendant Norman frequently sold crack cocaine from the apartment. Ms. Waters testified that Quan Wiggins sold ecstasy pills in the residence in the presence of Defendant Wilson and Defendant Norman. She said that two children, Nehemiah and Mych'keira, also lived in the apartment while she was there. Ms. Waters testified that she was not present when Nehemiah overdosed and was taken to the hospital.

Ms. Waters testified that she remembered police executing a search warrant on March 14, 2006, and Defendant Norman and Sonya Hendrix were present. She said that two children, Mych'keira and Defendant Norman's son, were also present. Ms. Waters testified that she received a citation for possession of drug paraphernalia, a crack pipe, and she said that she was smoking crack in the children's bedroom at the time. She said that Defendant Wilson's name was on the lease for the residence. Ms. Waters testified specifically that she had witnessed drug sales from the apartment by Defendant Norman and Defendant Wilson prior to March 14, 2006.

Ms. Waters was present when a search warrant was executed at the residence on July 12, 2006, and she again received a citation for possession of drug paraphernalia. She said that she was the only person inside, and Lashay Elliot was outside. Ms. Waters testified that there were times when Defendant Norman and Defendant Wilson were in the presence of each other when one of them sold drugs, and that the apartment was a known "crack house." Ms. Waters testified that she purchased crack cocaine at the residence, and she admitted that she has a lengthy history of drug related convictions. She further admitted that she sold cocaine from the residence to feed her habit, and she also sold beer from the residence. Ms. Waters testified that she saw Defendant Wilson sell food items such as candy, cokes, and popsicles from the apartment, and Sonya Hendrix also sold cocaine from the residence.

Laticia Stallings Lawrence, who was incarcerated at the time of trial, testified that she had six children, including Nehemiah and Mych'keira or "My-My." Nehemiah was born on June 16, 2004, and Mych'keira was born on August 11, 2005. Ms. Lawrence testified that she had known Defendant Wilson for ten years, and she also knew Defendant Norman. She said that after her incarceration, Defendant Wilson became the caretaker for Nehemiah, and Cynthia Savley was supposed to take care of Mych'keira. However, she later learned that Mych'keira had also been staying for periods with Defendant Wilson. There was no formal paperwork giving custody of her children to Defendant Wilson. Ms. Lawrence knew that Defendant Norman sometimes stayed with Defendant Wilson and had also watched Ms. Lawrence's children.

**Analysis**

**I. Motion to Sever Offenses and Defendants**

*Severance of Offenses*

Defendants Wilson and Norman argue that the trial court erred in denying their motions to sever the offenses in this case. They suggest that the renumbered offenses should have been severed according to the dates of the offenses: (1) Counts one and two on March 2, 2006; (2) Count three between January 1 and September 15, 2006; (3) Counts Four through Seven on March 14, 2006; and (4) Counts eight through twelve (charging only Defendant Wilson) on May 2, 2005.

Rule 14(b) of the Tennessee Rules of Criminal Procedure provides in pertinent part:

(1) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

A trial court's decision "to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) [Tennessee Rules of Criminal Procedure] [is] to be reviewed for an abuse of discretion." *State v. Shirley,* 6 S.W.3d 243, 247 (Tenn. 1999). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999). Our supreme court has explained that "when a defendant objects to a pre-trial consolidation motion by the state, the trial court must consider the motion by the severance provisions of Rule 14(b)(1), not the 'same or similar character' standard of Rule 8(b)." *Spicer v. State* 12 S.W.3d 438, 443 (Tenn. 2000). In reviewing the propriety of the consolidation of offenses prior to trial, the reviewing court should look to the evidence presented at the severance hearing. *Id.* at 447.

Common scheme or plan evidence tends to fall into one of three categories: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. *Moore,* 6 S.W.3d at 240. "The larger, continuing plan category encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993) (citing Neil P. Cohen et al., *Tennessee Law of Evidence*, § 404.11 (2nd ed. 1990)). "The same transaction category involves crimes which occur within a single criminal episode." *Id.*

-15-

In examining a trial court's determination on a severance issue, the second prong of Rule 14(b)(1) requires a showing that the evidence of one offense would be admissible in the trial of the others if the offenses became severed. *Spicer*, 12 S.W.3d at 445. To comply with the requirements in the second prong, the trial court must conclude that (1) the evidence of an offense is relevant to some material issue in the trial of the other offense under Tennessee Rule of Evidence 404(b)(2); and (2) the probative value of the evidence of the other offense is not outweighed by the prejudicial consequences of admission under Tennessee Rule of Evidence 404(b)(4). *State v. Hoyt*, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447 n. 12. In Tennessee, evidence of other offenses may be admissible to show (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. *Id.*

In the orders denying Defendants' motions for severance, the trial court made extensive findings:

> The Court finds that the Defendants are charged with a variety of drug-related offenses, including Conspiracy to Possess with Intent to Sell a Schedule II Controlled Substance. The Court finds that the fact that the State has charged the Defendants with conspiracy should not automatically direct the Court to deny the Motion to Sever. However, the Court finds that in this particular case, under the totality of the circumstances, the offenses are properly joined because they are part of a larger continuing plan to distribute narcotics from the residence at 28 Shep[ard] Street. The Court finds that based on the evidence presented at the hearings, the residence at 28 Shep[ard] Street has been under surveillance by law enforcement personnel for several months. The Court finds that at least three separate search warrants were obtained and executed at this address. The Court finds that numerous drug sales were observed and many controlled buys using confidential informants were conducted by law enforcement officers at this house. The Court finds that several drug-related arrests were made both inside and in the near vicinity of the residence. The Court finds particularly convincing that a note recovered from the refrigerator at 28 Shep[ard] Street is particularly convincing. The Court finds that this note essentially establishes guidelines for drug dealing at the residence.
>
> The Court finds that several of the offenses charged refer to child neglect and illegal drug distribution. However, the Court finds that these neglect charges are directly linked with the drug dealing at 28 Shep[ard] Street . . . . The Court finds that the first set of child neglect offenses concern Nehemiah Stallings,

who ingested several different illegal drugs, including cocaine, amphetamine, methamphetamine, and ecstasy, while residing at 28 Shep[ard] Street and allegedly in the care of the Defendants. The Court finds that the second set of child neglect offenses concern Mych'keira Stallings and Antoine Batey, who were present at 28 Shep[ard] Street at the time of Defendant Norman's arrest. The Court finds that these children were found within several feet of the illegal drugs confiscated during the search of the residence. The Court finds that Defendant Norman was allegedly the caretaker of these children at the time. Although there is some question as to the actual degree of responsibility each Defendant owed to the three children above, the Court finds that it would be inappropriate to determine the severance issue solely on whether, in the Court's opinion, the State will be able to carry its burden of proof on the issue at trial . . . . The Court is of the opinion that Counts [One] through [Seven] and [Thirteen] through [Sixteen] were committed in furtherance of a plan to systematically distribute narcotics from a residence at 28 Shep[ard] Street and, therefore, are part of a continuing plan or conspiracy as contemplated by the Tennessee Supreme Court.

Concerning the admissibility of the evidence, the trial court further found:

[T]he Court must decide whether the evidence of one offense would be admissible in the trials of the others. "Once the trial court determines that a common scheme or plan exists, it then must decide whether evidence of the plan is relevant to a material issue and balance the probative value of the evidence against the risk of unfair prejudice to the defendant." *State v. Leggs*, 2003 WL 21189783, *4 (Tenn. Crim. App. 2003). "[A]dmission of evidence of other crimes which tends to show a common scheme or plan is proper to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue." *State v. Hallock*, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993).

The Court finds that the evidence of one of the above offenses would be admissible in the trials of the others in order to show identity. The Court finds that identity has been raised as a issue in this case since the Defendants have denied that they are drug dealers and have denied any claim of ownership of the narcotics which were discovered by law enforcement officers during the numerous searches of 28 Shep[ard] Street. The Court finds that both Defendants have allegedly admitted that drug sales occurred at this residence, but have denied their involvement in such transactions. The Court finds that the Defendant Wilson had allegedly stated that the most plausible reason for the overdose of the child Nehemiah Stallings was due to the fact that an

-17-

acquaintance, Ms. Quaneisha [sic] Wiggins, may have accidently dropped an ecstasy pill on the bathroom floor while attempting to flush narcotics down the toilet at 28 Shep[ard] Street in anticipation of a police raid. The Court finds that while this tenuous explanation could justify the presence of ecstasy in Nehemiah Stallings' system, it certainly does not explain the presence of amphetamine, methamphetamine, and cocaine. Since neither of the Defendants has been able to provide a convincing explanation as to the presence of these drugs, coupled with the fact that both Ms. Wilson and Ms. Norman have denied any participation in drug sales, the Court is of the opinion that the identity of the owner of the narcotics recovered from 28 Shep[ard] Street, as well as the identity of the owner of the drugs found in Nehemiah Stallings' system, is in question. The Court is therefore of the opinion that the evidence of one of the above offenses would be admissible in the trials of the others in order to show identity.

The Court further finds that the evidence of one of the above offenses would be admissible in the trials of the others in order to rebut a defense of mistake or accident. The Court finds that . . . Defendant Wilson had allegedly stated that the child Nehemiah Stallings ingested an ecstasy pill belonging to Quaneisha [sic] Wiggins which had accidently fallen onto the bathroom floor. The Court finds that medical tests later revealed [that] Nehemiah Stallings had actually ingested several other drugs besides ecstasy, including amphetamine, methamphetamine, and cocaine. The Court is of the opinion that the State could introduce evidence of the other charged offenses in the indictment in order to show that the residence at 28 Shep[ard] Street was constantly inundated with drug dealers and narcotics and that the presence of several different drugs in Nehemiah Stallings' system was not accidental and likely not simply limited to the isolated incident involving Ms. Wiggins. Similarly, the Court is of the opinion that the State could introduce of [sic] the alleged child neglect charges involving Nehemiah Stallings to rebut any defense of mistake or accident which might be raised in defense of the second child neglect charges involving the children Mych'keira Stallings and Antoine Batey, which were allegedly discovered within several feet of illegal drugs at 28 Shep[ard] Street approximately two weeks after the hospitalization of Nehemiah Stallings. The Court is therefore of the opinion that the evidence of one of the above offenses would be admissible in the trials of the others in order to rebut a defense of mistake or accident.

The evidence presented at the pretrial hearing supports the trial court's decision to deny severance. Detective Sara Bruner testified that she responded to Vanderbilt Hospital around noon on March 3, 2006, because she had been notified by the Department of

Children's Services that a child, Nehemiah Stallings, was there and had ingested methamphetamines, cocaine, and ecstasy. She said that Nehemiah had arrived at the hospital around midnight, and he was having a seizure when she saw him.

Detective Bruner testified that Defendant Wilson said that she was Nehemiah's caretaker. Defendant Wilson said that a woman by the name of Quanisha (Quan) Wiggins, who sold ecstasy pills, had been at her home on March 2, 2006, when police arrived looking for someone. Defendant Wilson said that Quan Wiggins attempted to flush the ecstasy pills down the commode so police would not find them, and she assumed that some of the pills fell on the floor, and Nehemiah may have picked one up. Defendant Wilson also said that Quan's mother, Barbara Wiggins, was Nehemiah's babysitter, and he may have picked up something at her house. During the interview, Defendant Wilson said that Quan had been at her house twice on March 2, 2006. Detective Bruner testified that Defendant Norman and Michael Wilson were also at Defendant Wilson's residence that evening.

Detective Bruner testified that she spoke with Barbara Wiggins who said that Nehemiah left her residence around 6:00 p.m. on March 2, 2006, and his condition was good. She said that Defendant Norman told her

> that prior to the incident happening, with talking with Ms. Norman, she gave a reference to [sic] that Neimiah [sic] had picked up a pill, I believe, like a week before this incident happened on the 2nd. And she had taken it away from him. So it shows me that Ms. Norman was there at the residence on a frequent basis.

Detective Bruner testified that Defendant Norman said that she began staying with Defendant Wilson around the first of March. She had been previously living in a hotel. Defendant Norman was at the residence when Nehemiah was taken to the hospital. Detective Bruner testified that Defendant Norman suggested that Nehemiah had gotten the drugs from somewhere else and that Quan Wiggins had been in the residence.

Detective Bruner testified that Defendant Wilson and Defendant Norman were both interviewed at Vanderbilt Children's Hospital on March 3, 2006. During the interviews, neither of the defendants suggested a source for the drugs in Nehemiah's system, other than Quan Wiggins. Detective Bruner testified that Defendant Wilson denied using any drugs, but later admitted that she had used cocaine two weeks prior, and she had taken an ecstasy pill around a week before the incident. Defendant Norman said that she had used cocaine and taken half of an ecstasy pill on February 28, 2006. She said that Ms. Norman gave birth shortly after March 3, 2006, and tested positive for cocaine. Detective Eric Fitzgerald was sent to Defendant Wilson's residence on the evening of March 3, 2006, for a search. While waiting for DCS to arrive, he noticed four individuals, who appeared to be drug addicts, walk

up to Defendant Wilson's apartment located at 28 Shepard Street, Apartment C. They left when they noticed Detective Fitzgerald standing there. A patrol officer eventually arrived at the apartment and informed Detective Fitzgerald that it was a "known drug house." Detective Fitzgerald searched the apartment and found the corner of a sandwich baggie with some white residue on it.

Detective Bruner testified that Detective Fitzgerald arrived at the hospital and participated in interviewing Defendant Wilson. When he confronted her with information suggesting that her residence was a known drug establishment:

> She finally admitted to us that she does use drugs and that she had used cocaine as recently as the prior Sunday. And I believe this incident occurred on a Friday. So that would have been that - - that Sunday before that - - that Friday. That she said that she - - she's admitted that she allowed several different people into her house that deal drugs. And - - and she also admitted that she had allowed Nehemiah to stay with a lady that used crack cocaine.

Detective Bruner testified that Defendant Norman was later interviewed on April 8, 2006, while in custody. She said that someone named "Mikiah" had dropped an ecstasy pill in Defendant Wilson's house about a week before Nehemiah's overdose. Nehemiah brought the pill to her. Defendant Norman said that while she and Defendant Wilson were at Vanderbilt, Defendant Wilson indicated that she had called a homeless woman to clean up the apartment, and she overheard Defendant Wilson tell "either Sharon, Michael Wilson, which was - - is Danita Wilson's husband, or Keon, which was Danita's boyfriend, to clean up and make sure that nothing was lying around." She said that others were present in the apartment when Nehemiah overdosed, and she suggested that Defendant Wilson was an "on-going drug dealer selling out of her residence" and would have as many as thirty customers a day. Defendant Norman said that she was asleep on the couch when Nehemiah became sick.

Detective Bruner testified that she interviewed Barbara Wiggins who said that she had seen cocaine at Defendant Wilson's residence. She also said that she had approached Defendant Wilson about keeping Nehemiah because "she did not want the child to be in that type of environment - - it - - with that drug dealing going on." Based upon her investigation, Detective Bruner felt that Nehemiah ingested the drugs found in his system shortly before arriving at the hospital. She said there was nothing to suggest that he was suffering from any symptoms associated with the drugs prior to being discovered by Defendant Wilson's son with his eyes rolled back.

Detective Eric Fitzgerald testified that he was involved in an investigation at Defendant Wilson's apartment again on March 14, 2006. He said that "CSU" called him to

the residence because they had executed a search warrant, and found drugs and two young children in the apartment. He said that Defendant Norman was arrested in connection with the investigation. He thought that one of the children was Defendant Norman's son, who was ten or eleven, and the other child was under five. Detective Fitzgerald testified that he observed around an ounce of cocaine at the scene.

Detective Douglas Thibodeaux testified that he was involved in serving a search warrant at 28 Shepard Street, Apartment C, on March 14, 2006. While waiting outside the residence to execute the search warrant, he observed what appeared to be a "hand-to-hand" exchange between a Hispanic male and someone inside the apartment. He said that mail to the residence was listed in Defendant Wilson's name, and Lisa Waters, Lisa Hendrix, and Defendant Norman were inside the residence at the time. Detective Thibodeaux testified that the warrant was based on a controlled drug buy using a confidential informant conducted within seventy-two hours of the warrant being issued. During the search of the apartment, Detective Thibodeaux testified that around twenty grams of a white rock substance was found on the livingroom floor beside Defendant Norman's left hand, and there was a set of electronic scales underneath the couch. The scales were turned on at the time. There was also some cash in Defendant Norman's purse. Ms. Waters and Ms. Hendrix were in a bedroom and indicated that they "tidied up the house for crack." Both were charged with possession of drug paraphernalia. There were two small children in the apartment. Detective Thibodeaux thought that Defendant Norman said that one of the children belonged to Defendant Wilson, and the other was her own. He said that Defendant Norman told him that she did not live at the residence but was there with the children. She also said that the drugs did not belong to her and made three conflicting statements concerning the drugs. Detective Thibodeaux testified that DCS and Youth Services were familiar with the case because of the incident that happened there approximately one week earlier.

Detective Thibodeaux testified that another controlled buy took place at the residence, and a second search warrant was executed on July 12, 2006. He said that "a small bit of drug paraphernalia, $350.00 in two purses with Defendant Wilson's name on them, and a note on the refrigerator that "told them that they would owe them fifty ($50.00) dollars, and there was a time limit. And at the bottom of it where a normal person would sign, there was the letters, D.A., and then it was crossed through a lot." Detective Thibodeaux testified that Defendant Wilson was not at the residence at the time, and he left a card for her to call him. He said that there was also a trash can full of unopened beers with ice and water that Ms. Waters, who was also present during the previous search, said that she was selling out of the residence.

Detective Thibodeaux testified that on April 14, 2006, he, Detective Blazedale and other officers were conducting "buy busts" in the area of 28 Shepard Street. He said:

As we were driving around in the area, we were on the next street over from Shep[ard], a black female flagged us down. She walked up to the car and pretty much asked us what we need[ed]. I said twenty rock or some hard, which is street slang for crack cocaine. She told us to bust the block, which we did. We drove around. I didn't see her. We pulled back up and was [sic] we were - - I want to say it's John Street, but this is Shep[ard], we're on John Street. And from where we're sitting at John Street, you actually - - if you kept going on John Street across Shep[ard] you would run into 28th Street. You would run into the apartment complex. So we're sitting there looking at it. And we stopped. I watched the female walk up to a black male that was on the sidewalk in front of 28 Shep[ard]. They had some words. She held out her hand. He gave her something in her hand and she closed her hands. She walked over to the passenger side of our vehicle. She gave Detective Blazedale a small quantity of white rock substance, which later field tested positive for crack - - for cocaine base. He handed her the buy money. We called in. We pulled off, called in the takedown unit. As she was walking back to the black male, [they] were taken into custody. She still had the buy money in her hand. And they took him - - actually and I hate to do this without actually looking at the case file. He was found with some other stuff, too. I can't remember if it's him or the other guy that had the two guns and the marijuana, but like I said, I wasn't really prepared for Cortavius on this date, just Danita Wilson and Tiffany Norman.

Detective Thibodeaux testified that seventeen-year-old Cortavius Marable, Defendant Wilson's son, had two handguns ( a nine millimeter and a .25 caliber) and a bag of marijuana in his possession.

Officer Alisha Shoates testified that on August 25, 2006, she was working undercover for the Crime Suppression Unit and executed a search warrant at 28 Shepard Street, Apartment C. The warrant was based on a prior controlled buy from Defendant Wilson that Officer Shoates had participated in a day or two before. Officer Shoates testified that Defendant Wilson, Milford Gandy, Sonya Hendrix, Cortavius Marable, and Ashley Hamler were present. She said that several items were found during the search:

Crack cocaine, white powder, marihuana, digital scales, a marihuana blunt, white rocks, which also tested positive to have crack cocaine base. A Rueger [sic], .22 caliber, ten .22 caliber bullets, a crack pipe, pink pills . . . a pink bag with pink pills in it, and money in the amount of seven hundred and forty-eight ($748.00) dollars.

Officer Shoates testified that she was initially outside when the warrant was executed but was then called inside because Defendant Wilson attempted to run to the bathroom. She took Defendant Wilson into a bedroom to conduct a search. Officer Shoates testified that Defendant Wilson would not speak, and when she searched Defendant Wilson's bra area, Defendant Wilson bent over and would not comply with any verbal commands. When Officer Shoates placed Defendant Wilson in handcuffs, she began to pull away. Officer Shoates testified that she found white rocks that field tested positive for cocaine and money in Defendant Wilson's bra, and she found several rocks in her waistband. She said that Defendant Wilson then became "totally uncooperative" and lay on the bed and began kicking. She also refused to open her mouth. Officer Shoates thought that Defendant Wilson had a total of three grams of crack cocaine on her person.

Genae Cochran, a CPS Case Manager II with DCS, testified that she responded to 28 Shepard Street, Apartment C, on March 14, 2006. She arrived around 8:35 p.m and found two young children in the home, a toddler named Antoine Batey (four years old) and an infant named Mych'keira Stallings (less than one year old). Ms. Cochran learned that Defendant Norman was Antoine's mother, and that Mych'keira's mother, Laticia Stallings, was incarcerated. She explained that Mych'keira's legal custodian was Cynthia Savley; however, the infant was left in Defendant Wilson's care. Ms. Shoates testified that she removed both children from Defendant Wilson's residence. Mych'keria was temporarily placed in DCS custody, and Antoine's father, who had legal custody, picked him up.

In this case, as determined by the trial court, evidence of the indicted offenses that occurred over a five-month period was relevant to show a plan to systematically distribute drugs from the residence at 28 Shepard Street and, therefore, "are part of a continuing plan or conspiracy as contemplated by the [Tennessee case law]." The child neglect charges directly relate to the ongoing drug activity at the residence and show that the Defendants acted knowingly in exposing the children in the residence to drugs. Furthermore, evidence of one of the offenses would be admissible in the trial of the others to rebut a defense of mistake or accident since the Defendants suggested that someone else may have dropped the drugs that were ingested by Nehemiah Stallings. The proof of the ongoing drug activity was also relevant to show that Defendants knowingly exposed Mych'keira Stallings and Antoine Batey to illegal drugs at the residence. Defendants are not entitled to relief on this issue.

*Severance of Defendants*

Defendant Wilson and Defendant Norman also argue that the trial court erred in failing to sever the trial of the defendants. They allege that because Defendant Norman made statements indicating that Defendant Wilson sold crack and that she called someone from the hospital after the overdose of Nehemiah Stallings to ask the person to clean the apartment

of drugs, they should not have been tried together. They also contend that a severance should have been granted as necessary for a fair determination of guilt or innocence.

"The practice of trying co-defendants in a single trial is 'aimed at achieving improved judicial economy and efficiency.'" *State v. Mickens*, 123 S.W.3d 355, 383 (Tenn. Crim. App. 2003) (quoting Tenn. R. Crim. P. 8, Committee Cmts.). A trial court must grant a severance before trial, however, if "appropriate to promote a fair determination of the guilt or innocence of one or more defendants," and during trial if "necessary to achieve a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14 (c)(2)(A) and (B). The grant or denial of a motion for severance is a matter that rests within the sound discretion of the trial court. *Mickens*, 123 S.W.3d at 383 (citing *State v. Maddox*, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997)). "This court has held, '[w]here a motion for severance had been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his co-defendant[s].'" *Mickens*, 123 S.W.3d at 383 (quoting *State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000)).

It is not unusual in a joint trial for one defendant to attempt to lay blame on the other. *See State v. Ensley*, 956 S.W.2d 502 (Tenn. Crim. App. 1996); *State v. Robinson*, 622 S.W.2d 62 (Tenn. Crim. App. 1980). However, antagonistic defenses are not prejudicial *per se*. *State v. Gosnell*, 62 S.W.3d 740 (Tenn. Crim. App. 2001); *Ensley*, 956 S.W.2d at 509; *see also Zafiro v. United States*, 506 U.S. 534, 538-539, 113 S.Ct. 933, 938 (1993). Indeed, severance is not necessarily warranted even if prejudice is shown. *Zafiro*, 506 U.S. at 538-539, 113 S.Ct. at 938. Defendants must establish that they were so prejudiced that granting a severance ceased to be within the trial court's discretion. *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

In denying the Defendants' motions, the trial court noted that "the State 'does not intend to rely on these portions of Defendant Norman's second statement which implicate Defendant Wilson. The State believes that these portions of the statement can be excised to avoid a *Bruton* issue and to permit a joint trial.'" The trial court further found:

> The Defendants argue that the Court should grant a severance to promote a fair determination of the guilt or innocence of each Defendant. The Court finds, however, that no persuasive grounds were presented at the hearings or in the Memoranda which give merit to this claim. Both Defendants appear wary of a jury's prospective ability to distinguish between the different alleged criminal episodes and corresponding evidence in this case, as well as a jury's ability to properly dissociate each Defendant from the other in reaching their verdict. However, the Court finds that, with proper instruction, a jury will be able to properly consider the guilt or innocence of each of the Defendants at

a joint trial. The Court is of the opinion that since no evidence was presented which establishes that a fair determination of the guilt or innocence of the [D]efendants could not be conducted, the Motions to Sever Defendants should be denied on these grounds.

We conclude that the trial court in this case did not abuse its discretion when it denied the Defendants' motions to sever the trials of the Defendants. Neither Defendant has clearly demonstrated how she was prejudiced by being tried jointly. Defendants are not entitled to relief on this issue.

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). A conviction may be based entirely on circumstantial evidence where the facts are so clearly interwoven and connected that the finger of guilt is pointed at the Defendant and the Defendant alone." *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 002) (quoting *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993)).

### 1. Child Neglect (Counts One and Two- Merged by the Trial Court)

T.C.A. § 39-15-401(b) defines child neglect as follows:

Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

In *State v. Sherman*, 266 S.W.3d 395, 404 (Tenn. 2008) our supreme court noted:

> The section pertaining to neglect is composed of three essential elements: (1) a person knowingly must neglect a child; (2) the child's age must be within the applicable range set forth in the statute; and (3) the neglect must adversely affect the child's health and welfare. *State v. Mateyko*, 53 S.W.3d 666, 670 (Tenn. 2001); *Ducker*, 27 S.W.3d at 896.

The Court further noted: "In order to establish neglect, the State must first prove that a defendant owes a legal duty to the child. *Mateyko*, 53 S.W.3d at 671." *Sherman*, 266 S.W.3d at 404.

While our criminal code does not define "child neglect," the Supreme Court in *Sherman* provided the following concerning the term "custodian" when the defendant was neither a parent nor legal guardian of the child:

> A "custodian" is defined as "a person, other than a parent or legal guardian, *who stands in loco parentis to the child* or a person to whom temporary legal custody of the child has been given by order of a court." Tenn. Code Ann. § 37–1–102(b)(7) (2005) (emphasis added). Our Court of Appeals has ruled, " 'Where one is in loco parentis the rights, duties, and liabilities of such person are the same as those of the lawful parent.'" *Hollis v. Thomas*, 42 Tenn. App. 407, 303 S.W.2d 751, 761 (1957) (quoting 67 C.J.S. *Parent and Child* § 71). That assessment is consistent with the common law. *Niewiadomski v. United States,* 159 F.2d 683, 686 (6th Cir. 1947) ("At common law a parent is charged with the duty of educating and supporting a minor child.... The same rights and duties exist when the relationship of in loco parentis has been intentionally assumed and established."). We hold, therefore, that our criminal code envisions that a person standing in loco parentis to a child may be subject to criminal liability for child neglect.

> "In loco parentis" is, of course, Latin for "in the place of a parent." *Geibe v. Geibe,* 571 N.W.2d 774, 780–81 (Minn. Ct. App. 1997). The term extends as far back as Sir William Blackstone. *See* 1 *Commentaries* \*453. Generally, someone who holds that status has assumed the traditional obligations of a parent without a formal adoption. *Niewiadomski,* 159 F.2d at 686; *see also* 67A C.J.S. *Parent and Child* § 345 (2002). Our state has long recognized the doctrine. *See, e.g., Whitworth v. Hager*, 124 Tenn. 355, 140 S.W. 205, 207 (1910); *Norton v. Ailor*, 79 Tenn. 563, 566 (1883); *Maguinay v. Saudek*, 37 Tenn. (5 Sneed) 146, 148 (1857). Years ago, this Court ruled that "a tutor, teacher, or testamentary guardian, and ... a legal substitute for a

guardian" might stand in loco parentis. *State v. Davidson,* 134 Tenn. 482, 184 S.W. 18, 19 (1916). Further, one might be so classified for a limited time and for a limited purpose. *Phillips v. Johns*, 12 Tenn. App. 354, 357 (1930) (stating that the "teacher stands in loco parentis, but to a limited extent only"). Finally, a person also may assume the full responsibilities of a parent under the doctrine. *Norton*, 79 Tenn. at 566 (stating that when a stepfather admits a child into his household, he assumes "the obligation of the father as respects the support of his minor child") (citing *Maguinay*, 37 Tenn. at 147). When one establishes an in loco parentis relationship, that person assumes both duties and interests with regard to a child. *See Vol. State Life Ins. Co. v. Pioneer Bank*, 46 Tenn. App. 244, 327 S.W.2d 59, 62 (1959) (holding that someone standing in loco parentis has a sufficient interest to buy valid life insurance for a child).

Despite our long adherence to the in loco parentis doctrine, none of our rulings address the nature of the accompanying obligations for the purposes of child neglect. Other states have determined that the key element is one of intent—whether the adult intended to assume parental duties. *Molock v. Dorchester County Family YMCA, Inc*., 139 Md. App. 664, 779 A.2d 963, 967 (2001) (stating that in loco parentis is "a question of intention") (quoting *Vonder Horst v. Vonder Horst*, 88 Md. 127, 41 A. 124, 126 (1898)); *Searle v. Searle*, 38 P.3d 307, 319 n. 11 (Utah Ct. App. 2001) (stating that whether someone assumes obligations in loco parentis "depends on whether that person *intends* to assume that obligation") (emphasis in original) (quoting *Gribble v. Gribble*, 583 P.2d 64, 66 (Utah 1978)); 67A C.J.S. *Parent and Child* § 346 ("Whether the relationship of loco parentis exists is a matter of intention to be shown by the facts of the particular case...."). We agree with this assessment. A fact-finder may infer intent from circumstantial evidence. *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 885 (Tenn. 1973). While not exclusive, some facts to consider when determining whether a person had the intent to establish an in loco parentis relationship may include the child's age, the child's dependence upon the person claimed to be in loco parentis, and whether that person supports the child and exercises the duties and obligations of a natural parent. *Gritzner v. Michael R.*, 235 Wis.2d 781, 611 N.W.2d 906, 919–20 (2000) (quoting *McManus v. Hinney*, 31 Wis.2d 333, 143 N.W.2d 1 (1966)).

*Sherman*, 266 S.W.3d at 405-07 (footnotes omitted).

Defendant Wilson argues that there was no proof that she neglected Nehemiah Stallings because there were at least four other adults present in the residence who could

have dropped the drugs ingested by Nehemiah. Defendant Norman contends that the evidence is insufficient to support her convictions for child neglect because she did not have any duty of care toward Nehemiah Stallings.

In this case, the proof establishes an in loco parentis relationship between Defendant Wilson and Nehemiah Stallings and that she neglected the child as to adversely affect his health and welfare. Twenty-month-old Nehemiah Stallings was taken to the emergency room at Vanderbilt University Medical Center during the early morning hours of March 3, 2006, by Defendants Wilson and Norman. He was having seizures, and it was determined that he had ingested cocaine, ecstasy, and methamphetamines shortly before his arrival at the hospital. Because of concerns that a prolonged seizure might affect Nehemiah's ability to breathe, he was given several anti-seizure medications in the emergency room. Dr. Gay testified that Nehemiah began having seizures again after he received a CAT scan and was taken back to the emergency room for additional medication. Nehemiah also had evidence of tachycardia.

Dr. Gay saw Nehemiah on March 4, 2006. He said that Nehemiah did not have normal mental status at that time and that the child would be calm and then have periods of significant agitation. Dr. Gay testified that Nehemiah had to be given doses of Benadryl in order to calm him down so he would not get hurt flinging himself against the crib. He also said that the crib had to have a top because Nehemiah had been able to climb out of the crib and hurl himself against the wall. Dr. Gay saw Nehemiah again on March 5, 2006. The child was better but unable to walk. Dr. Gay testified that without treatment, "potentially it could have been life threatening and cause an arrest."

At the hospital, Defendant Wilson told Detective Bruner that she was keeping Nehemiah for his mother, who was in jail. She also admitted to using cocaine and ecstasy only days before the child's overdose. Defendant Wilson also told Linda Roberts, a social worker, that she was Nehemiah's mother. Laticia Stallings Lawrence testified that after her incarceration, Defendant Wilson became caretaker for her son Nehemiah. Barbara Wiggins testified that Defendant Wilson and Defendant Norman dropped Nehemiah off at her residence the day before his overdose.

The proof showed that Defendant Wilson was aware of the continuous drug activity at the Shepard Street apartment and that she knowingly exposed Nehemiah and other children to an environment where dangerous drugs were both sold and used. Detective Fitzgerald testified that he observed individuals who appeared to be drug addicts walk up to Defendant Wilson's apartment and that the activity there was consistent with a drug house. There was testimony that Quan Wiggins, who sold ecstasy pills from the apartment, was frequently there. Several controlled buys were made at the residence after Nehemiah's overdose.

During the search of the apartment on March 14, 2006, less than two weeks after the overdose, police found 17.7 grams of cocaine, electronic scales, crack pipes, plastic tear-off baggies, and $310.00 in Defendant Norman's purse. The cocaine was found near Defendant Norman's hand, and scales were under the couch where she had been sitting. During a search conducted on July 12, 2006, officers found a note on Defendant Wilson's refrigerator indicating that anyone selling drugs out of the apartment must pay her fifty dollars per day and that no one would be served after 12:00 a.m. During the search on August 25, 2006, officers searched Defendant Wilson and found several rocks of crack cocaine and pills containing a blend of drugs, which she had in a bag in her mouth. Defendants Wilson and Norman sold drugs in each other's presence, and the apartment was in a known drug area and was a known "crack house."

As to Defendant Norman, the record does not demonstrate an in loco parentis relationship under *Sherman* between her and Nehemiah Stallings. Although she was staying with Defendant Wilson and was present at the time of the overdose, there is not enough proof to show that Defendant Norman owed any duty of care to Nehemiah. The State acknowledged in its brief that "[t]he record reveals very little about the relationship between the child victim, Nehemiah Stallings, and Defendant Norman." The proof showed that Defendant Wilson was caring for Nehemiah when he became sick, and there was no testimony that Defendant Norman had any role as his caretaker at the time. The evidence presented at trial shows that Defendant Norman was asleep on the couch and was awakened when Nehemiah began vomiting. She was then awakened a second time by Defendant Wilson to drive her and Nehemiah to the hospital.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant Wilson's convictions for child neglect in counts one and two. The evidence is insufficient, however, to support Defendant Norman's convictions in counts one and two, and those must be reversed and the charges dismissed.

*2. Conspiracy to Possess Cocaine With Intent to Sell and Facilitation of Conspiracy (Count Three)*

Pursuant to T.C.A. § 39-17-417 (a)(3) it is an offense for a defendant to knowingly sell a controlled substance. T.C.A. § 39-12-103(a) defines conspiracy as:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

-29-

T.C.A. § 39-11-403(a) defines facilitation as follows:

> A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402, the person knowingly furnishes substantial assistance in the commission of the felony.

The proof shows that there was an on-going criminal enterprise of drug activity at Defendant Wilson's residence located at 28 Shepard Street, Apartment C. On March 3, 2006, Nehemiah Stallings overdosed on cocaine, methamphetamine, and ecstasy. A jury could infer the drugs were found by the child in the residence. Both Defendants were present at the time of the overdose. While waiting at the residence to conduct a search after the overdose, Detective Fitzgerald observed several people that appeared to be drug addicts walk up to the apartment and knock on the door. He testified that the activity at the residence, which was in a known drug area, was consistent with a drug house. Controlled buys were made at the residence on March 8, April 14, July 5, and August 24, 2006. A search warrant was executed at the apartment on March 14, 2006, resulting in the seizure of 17.7 grams of cocaine, electronic scales, crack pipes, plastic tear-off baggies, and $310.00 from Defendant Norman's purse. The cocaine was found near Defendant Norman's hand, and scales were under the couch where she had been sitting. The buy on April 14, 2006, was made in front of Defendant Wilson's residence and involved her seventeen-year-old son. At the time of his arrest, he was in possession of two loaded weapons and marijuana.

During a search conducted on July 12, 2006, officers found a note on Defendant Wilson's refrigerator indicating that anyone selling drugs out of the apartment must pay her fifty dollars per day and that no one would be served after 12:00 a.m. During the search on August 25, 2006, officers searched Defendant Wilson, who was combative. Officers found several rocks of crack cocaine on Defendant Wilson's person, and she had a baggie containing two pinks pills in her mouth. A loaded .22 Ruger pistol was found under the bed in one of the bedrooms. Police also seized several other white rocks, a bag of white powder, marijuana, a pink pill, $750, two sets of electronic scales, and various crack pipes. One of the pills was tested, and it contained MDMA and methamphetamine. Lisa Waters testified that Defendant Norman and Defendant Wilson frequently sold crack cocaine from Apartment C at 28 Shepard Street, and Quan Wiggins sold ecstasy pills out of the apartment in the presence of both Defendants. Ms. Waters further testified that Defendant Norman and Defendant Wilson sold drugs in each other's presence, and the apartment was a known "crack house."

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant Wilson's conviction for conspiracy to possess

cocaine with intent to sell and Defendant Norman's conviction for facilitation of that conspiracy.

### 3. *Possession of Cocaine With Intent to Sell (Counts Four and Eight)*

As previously stated, it is an offense for a defendant to knowingly sell a controlled substance. T.C.A. § 39-17-417 (a)(3). "Possession" may be actual or constructive, and may be proven by circumstantial evidence. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). Constructive possession requires proof that a person had the power and intention at a given time to exercise dominion and control over the drugs either directly or through others. *Shaw*, 37 S.W.3d at 903 (quoting *State v. Patterson*, 966 S.W.2d 435, 444 (Tenn. Crim. App. 1997)). In other words, "constructive possession is the ability to reduce an object to actual possession." *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (citations omitted). Furthermore, while mere presence at a place where controlled substances are found does not support an inference of possession, a person in possession of the premises where controlled substances are found may be presumed to also possess the controlled substances found there. *State v. Transou*, 928 S.W.2d 949, 955-56 (Tenn. Crim. App. 1996); *see also Armstrong v. State*, 548 S.W.2d 334 (Tenn. Crim. App. 1976).

Defendant Wilson argues that because she was not present when 17.7 grams of cocaine was found in the apartment on March 14, 2006, she is not guilty of possession of cocaine with intent to sell. However, this Court may infer "that the person in possession of the premises, the defendant, was also in possession of the controlled substances therein." *State v. Leon Goins*, No. W2009-02096-CCA-R3-CD, 2010 WL 3862076 at * 4 (Tenn. Crim. App. Oct. 4, 2010), *no perm. app. filed*. In this case, the proof shows that Defendant Wilson was the leaseholder of 28 Shepard Street, Apartment C, and she lived there. The evidence presented demonstrated that she participated in drug sales from the residence, and she knew that others sold drugs out of the residence and demanded that they compensate her for using the apartment. There was also testimony that Quan Wiggins and Defendant Norman sold drugs from the residence in Defendant Wilson's presence. Therefore, a jury could reasonably infer that she was in constructive possession of the cocaine seized from her apartment on March 14, 2006.

Likewise, the evidence was sufficient to support Defendant Wilson's conviction for possession of 0.5 grams or more of cocaine with intent to sell on August 25, 2006. She argues that the evidence was insufficient to establish her intent to sell. Officer Alisha Shoates testified that when police entered the apartment on August 25, 2006, Defendant Wilson attempted to run into the bathroom; however, she was intercepted and taken into a bedroom to be searched. Officer Shoates found a rock of crack cocaine and money in Defendant Wilson's bra and four rocks of crack cocaine in her waistband. She eventually

spat out a bag containing two pink pills.  Police also found a .22 Ruger pistol under the bed, around $750.00, two sets of digital scales, and various crack pipes.  Sergeant Steven Brady testified that the scales were commonly used for weighing crack cocaine.

A note found on Defendant Wilson's refrigerator during a previous search essentially gave instructions to those people selling drugs from the residence.  Lisa Waters also testified that she had observed drug sales by Defendant Wilson.  All of the evidence was sufficient for a rational trier of fact to find Defendant Wilson guilty of possession of 0.5 grams or more of cocaine with intent to sell.

*4.  Attempted Aggravated Child Neglect of Mych'keira Stallings and Antoine Batey and Reckless Endangerment of Antoine Batey (Counts Six and Seven)*

Pursuant to T.C.A. § 39-15-402:

(a) A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and:

(1) The act of abuse, neglect or endangerment results in serious bodily injury to the child.

(2) A deadly weapon, dangerous instrumentality or controlled substance is used to accomplish the act of abuse, neglect or endangerment; or

(3) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim.

Criminal attempt is defined as:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

-32-

(2) Acts with the intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a).

With respect to reckless endangerment, T.C.A. § 39-13-103(a) provides: "A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury."

The evidence showed that Defendant Wilson and Defendant Norman were aware of the ongoing sale and use of illegal drugs at the residence on 28 Shepard Street. On March 14, 2006, Mych'keira Stallings, who was less than a year old, and four-year-old Antoine Batey were at the residence with Defendant Norman when police executed a search warrant and found 17.7 grams of crack cocaine within reach of Defendant Norman's hand. Defendant Norman told police that Mych'keira belonged to Defendant Wilson, and Antoine belonged to her. Although there were two other adults present when police entered the residence, they were in a back bedroom, and the children were on the couch in the livingroom with Defendant Norman. Mych'keira's birth mother, Laticia Stallings, testified that Cynthia Savley was supposed to take care of Mych'keira while Ms. Stallings was incarcerated; however, she learned that the child had been staying with Defendant Wilson for periods of time. She said that Defendant Norman sometimes watched her children. There was no testimony that the other two adults in the residence watched Mych'keira. Barbara Wiggins testified that she took care of two children, Nehemiah Stallings and Mych'keira Stallings, who were living with Defendant Wilson. She further said that Defendant Wilson and Defendant Norman would both drop the children off at her house.

Based on the evidence presented at trial, a jury could reasonably infer that Defendant Wilson assumed the care and responsibility for Mych'keira Stallings on March 14, 2006. Likewise a jury could infer that based on Defendant Norman's relationship with Defendant Wilson and her role as a babysitter on March 14, 2006, that she stood in loco parentis to Mych'keira and assumed a duty of care. As to Antoine Batey, there is no question that Defendant Norman was his mother and that she possessed more than seventeen grams of crack cocaine in his presence.

Concerning Defendant Wilson, the evidence presented proved that she maintained an environment of continuous drug activity at her apartment and exposed small children to drugs. The jury could reasonably conclude that Defendant Wilson knowingly created the danger of injury to Antoine Batey. Therefore, the evidence was sufficient to prove that Defendant Wilson and Defendant Norman were guilty of attempted aggravated child neglect and that Defendant Wilson was guilty of reckless endangerment.

*Thirteenth Juror*

Defendant Wilson also contends that the trial judge who presided over her trial erred in performing his role as thirteenth juror by approving the verdicts.

Tennessee Rule of Criminal Procedure 33(d) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). Rule 33(d) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. *Id.* Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment. *Id.* Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995).

In this case, Defendant Wilson does not assert that the trial court failed to perform its duty or that the trial court indicated any disagreement with the jury's verdicts. Rather, she contends that the trial court improperly approved the verdicts. The record reflects that the trial court noted verbally that each of the jury's verdicts "will become the judgment of the Court." In the motion for new trial, the court further noted that "a reasonable jury could have found the Defendant guilty of all charges and that this issue is without merit." As previously held by this Court: "It is not our function to reweigh the evidence but merely to ensure that the trial court complied with its duty under Rule 33(d)." *State v. Ronald Dillman*, *Jr.*, No. E2009-00648-CCA-R3-CD, 2010 WL 1854135, at *8 (Tenn. Crim. App. May 7, 2010), *perm. app. denied* (Tenn. Oct. 12, 2010). Defendant Wilson is not entitled to relief on this issue.

## III.  Suppression of Defendant Norman's Statements

Defendant Norman argues that the trial court erred in failing to suppress statements that she made to police on March 3, 2006. More specifically, she asserts that she was subject to custodial interrogation without being informed of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). We disagree.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *See id.* However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo. State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, and warnings must be given. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, (1966).

The trial court made the following findings:

The Court finds that the initial interview of [Defendant Norman] at Vanderbilt Children's Hospital was not a custodial interrogation and, therefore, her Fifth Amendment rights were not violated. The Court finds that the interview occurred at the hospital a short time after the Defendant and the co-defendant arrived with the victim. The Court finds that Detective Bruner attempted to gather information regarding the circumstances of the victim's health. The Court finds that Detective Bruner was polite and courteous throughout the interview. The Court finds that the Defendant was not arrested at the conclusion of the interview. The Court is of the opinion, under the totality of the circumstances, that the Defendant was not subjected to a custodial interrogation and, therefore, her Fifth Amendment rights were not violated. The Court is therefore of the opinion that the Defendant's statements from the initial interview at Vanderbilt Children's Hospital are admissible at trial.

The Court finds that the second interview of [Defendant Norman] was not a custodial interrogation and, therefore, her Fifth amendment rights were not violated. The Court finds that the second interview occurred later in the evening after the initial interview was completed. The Court finds that the Defendant was not compelled by Detective Bruner or any other member of the police department to remain at the hospital after the initial interview ended. The Court finds that Detective Bruner again attempted to gather information regarding the circumstances which led to the victim's hospitalization. The Court finds that Detective Bruner was polite and courteous throughout the interview. The Court finds that the Defendant was not restrained during the interview. The Court finds that the Defendant was not arrested at the conclusion of this interview. The Court is of the opinion, under the totality of the circumstances, that the Defendant was not subjected to a custodial interrogation and, therefore, her fifth amendment rights were not violated. The Court is therefore of the opinion that the Defendant's statements from the second interview at Vanderbilt Children's Hospital are admissible at trial.

The record supports the trial court's findings. At the suppression hearing, Detective Sara Bruner testified that her first contact with Defendant Norman was at the hospital on March 3, 2006. She took a report around 7:30 p.m., and Detective Okert and Mr. Fornash with DCS were also present. Detective Bruner testified that Mr. Fornash was in and out of the meeting with Defendant Norman, and the recorded interview took place in a conference room with the door shut. Although the officers were in plain clothes, some of them were armed. She said that Defendant Norman did not appear to be under the influence of anything, her responses were appropriate, and visually, she did not appear to be mentally impaired. Detective Bruner testified that Defendant Norman did not make any requests or ask to leave, and she was not physically restrained or told that she could not leave. She said that Defendant Norman was very cooperative and never expressed reluctancy to speak with them. Defendant Norman indicated that she had been at the home when the victim got sick, and she rode to the hospital with the child. She said that she wanted to be there for Defendant Wilson. At the time, Defendant Norman did not say that she or anyone else had provided the drugs. Detective Bruner testified that during the first interview, Mr. Fornash asked Defendant Norman some questions that led her to understand that her children were going to be safely placed. However, nothing else was said to her to suggest any consequences of involvement with the police department or DCS.

Detective Bruner testified that a second interview took place later that night at the hospital, and she was sure that it was to learn more about the facts and other information that had been obtained. She said that Defendant Norman was not instructed to remain at the hospital between the first and second interviews, and Defendant Norman was approached about the second interview because she was still there and available. Detective Bruner

testified that Defendant Norman expressed no reluctancy to speak during the second interview, and it was also recorded. She said that Detective Okert was also present for the second interview. Detective Bruner testified that Defendant Norman was not physically restrained during the second interview, and she was never arrested. Detective Bruner testified that she did not advise Defendant Norman of her *Miranda* rights prior to either interview because they were "just investigating the case, we were there trying to figure out what happened to this baby."

The recording of the first interview reflects that Detective Bruner told Defendant Norman that she was not in trouble and that they were there to figure out what happened and that they needed the truth. Although Defendant Norman sounded upset during the interview, it is apparently due to Nehemiah's condition and her fear of being in trouble. During the first interview, Defendant Norman was allowed to take a call on her cell phone. At the end of the first interview, Defendant Norman asked if she would be able to leave, and Detective Bruner responded, "I mean, I don't - I can't think of anything else to ask you. Um-" the recording then ended. Detective Bruner testified that she may have told Defendant Norman that "we need to talk to you," but she did not recall telling her not to leave.

The record supports the trial court's findings that the two interviews were not custodial interrogations. Therefore, the trial court properly denied Defendant Norman's motion to suppress.

### IV. Defective Indictment

Defendants Wilson and Norman argue that counts one, two, six, and seven of the indictment were constitutionally defective because they reflected improper elements of the charged offenses of aggravated child neglect and attempted aggravated child neglect. Initially, we note that Defendants did not raise this issue prior to trial. Tennessee Rule of Criminal Procedure 12(b)(2) provides that defenses and objections based on a defective indictment must be raised prior to trial or they are deemed waived. *See Wyatt v. State*, 24 S.W.3d 319, 322 (Tenn. 2000).

In any event, under both the United States and the Tennessee Constitutions, a charging instrument, such as an indictment, must inform the accused of "the nature and cause of the accusation." *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition to these constitutional guarantees, Tennessee Code Annotated section 40-13-202 requires that an indictment

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of

certainty which will enable the court on conviction, to pronounce the proper judgment....

An indictment need not set forth the theories available to support a conviction of the charged offense. *State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999). A panel of this Court has previously concluded, "the language in [Defendant's] indictment suggesting the State's reliance upon a theory of criminal responsibility is mere surplusage." *State v. Barry Waters Rogers*, No. M1999-01389-CCA-R3-CD, 2000 WL 1612304, at *2 (Tenn. Crim. App., at Nashville, Oct. 30, 2000), *no perm. to appeal filed*. An indictment is not fatal because of the inclusion of surplusage if, after eliminating the surplusage, the offense is still sufficiently charged. *State v. Culp*, 891 S.W.2d 232, 236 (Tenn. Crim. App. 1994).

In this case, the trial court first identified the discrepancy between the language of the indictment in counts one, two, six, and seven and the pattern jury instructions for child neglect after the State had presented nearly all of its proof. Count one of the indictment contained the following language:

> The Grand Jurors . . . present that Danita Lanette Wilson and Tiffany Nicole Norman, a.k.a. Tiffany Nicole Curry, on the 2nd day of March, 2006, in Davidson County, Tennessee and before the finding of this indictment, did knowingly, other than by accidental means, neglect Nehemiah Stallings [ ], a child under eight (8) years of age or less, so as to adversely affect the child's health and welfare, and the act of neglect resulted in serious bodily injury to the child, in violation of Tennessee Code Annotated § 39-15-402, and against the peace and dignity of the State of Tennessee.

Count two of the indictment contained identical language but alleged an alternative theory of aggravated child neglect. The indictment as to count six alleged:

> The Grand Jurors . . . present that Tiffany Nicole Norman, a.k.a. Tiffany Nicole Curry, and Danita Lanette Wilson on the 14th day of March, 2006, in Davidson, County, Tennessee and before the finding of this indictment, did attempt knowingly, other than by accidental means, [to] neglect Mych'keira Stallings [ ], a child eight (8) years of age or less, so as to adversely affect the child's health and welfare and where a controlled substance is used to accomplish the act of neglect, in violation of Tennessee Code Annotated § 39-12-101, and against the peace and dignity of the State of Tennessee.

The language in count seven was identical to count six with Antoine Batey listed as the victim.

Prior to 1989, child abuse and child neglect were defined in the following terms: "Any person who maliciously, purposely, or knowingly, **other than by accidental means**, treats a child under eighteen (18) years of age in such manner as to inflict injury or neglects such a child as to adversely affect its health and welfare is guilty of a misdemeanor[.]" (*emphasis added*); *See* T.C.A. § 39-4-401(a) (1982). At the time of the offenses, and under the current version of the law, to commit aggravated child abuse and aggravated child neglect and endangerment, one must commit child abuse, or child neglect, or child endangerment as defined in § 39-15-401(a),(b), or (c) and:

(1) The act of abuse, neglect or endangerment results in serious bodily injury to the child;

(2) A deadly weapon, dangerous instrumentality or controlled substance is used to accomplish the act of abuse, neglect or endangerment; or

(3) The act of abuse, neglect or endangerment was especially heinous, atrocious or cruel, or involved the infliction of torture to the victim; or

(4) The act of abuse, neglect or endangerment results from the knowing exposure of a child to the initiation of a process intended to result in the manufacture of methamphetamine as described in § 39-17-435.

T.C.A. § 39-15-402(a).

At the time of the offenses, and under the current version of the statute, T.C.A. § 39-15-401(a) defines child abuse as follows:

Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony.

Pursuant to T.C.A. § 39-15-401(b) child neglect is defined as:

Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

In this case, as pointed out by the trial court and the State, under the current version of the statute, the offense of child abuse under § 39-15-401(a) requires proof that a defendant

"acted knowingly, other than by accidental means" to injure a child. However, proof that a defendant acted "knowingly, other than by accidental means" is no longer required to prove neglect. The four offenses in question in this case allege neglect rather than abuse. At a conference with the attorneys, the trial court stated:

> I do think that the case law, a lot of the recent case law doesn't require a rigid following of - of some of the language that's not necessarily pertinent to what the charge is that we're here about. I think it's obvious that what we are here about is a case of child neglect, not child abuse. And it's aggravated because of the circumstances that are alleged. And the Court is of the opinion . . . that the section of the code charged controls what the law is in this case that I'm going to instruct the jury about and what you'll need to consider. And Section 39-15-402, as it relates to neglect, not abuse, doesn't have in the law that we're using now other [sic] by accidental means. So I think that the state should not have included that language in the indictment and I'm very sorry that they did or we wouldn't be going through this here now. But I do think that a defendant is put on notice in the case by the code section that we have, which has to do with the neglect so as to adversely affect the child's health and welfare and that the act resulted in serious bodily injury or was done with a controlled substance. And I think the language is other than by accidental means is - and I have a hard time saying the word myself, superaledge [sic] to what the defendant was given notice of under the section of the code, 39-15-402.

When the trial court gave the jury charge as to the charges of aggravated child neglect and attempted aggravated child neglect, it made no reference to the language "other than by accidental means," but instructed the jury as to the legal elements of aggravated child neglect and attempted aggravated child neglect.

The indictment in this case sufficiently charges the statutory elements of aggravated child neglect and attempted aggravated child neglect even after removal of the surplusage and includes an appropriate citation to the statute. *See State v. Griffis*, 964 S.W.2d 577, 591 (Tenn. Crim. App. 1997) ("As a general rule, it is sufficient to state the offense in the words of the statute, or words which are the equivalent to the words contained in the statute.") We conclude that Defendants are not entitled to relief on this issue.

### V. Failure to Exclude Evidence of Defendant Norman's Pregnancy

Defendant Norman contends that the trial court erred by failing to exclude testimony concerning her pregnancy in March of 2006 when counts one through seven of the indictment occurred. More specifically, she asserts that since the testimony was introduced

in conjunction with evidence that she used drugs during her pregnancy, it is evidence of other crimes, wrongs, or acts. She further argues that the testimony was admitted to show her propensity to knowingly expose other children to drugs.

Tennessee Rule of Evidence 404(b) provides that evidence of other crimes or acts, although not admissible to prove the character of a person in order to show action in conformity with the character trait, may be admissible for other purposes. Prior to allowing such proof, the trial court should conduct a jury-out hearing, determine whether there is a material issue other than conduct conforming with the character trait, and must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b); *State v. West*, 844 S.W.2d 144, 149 (Tenn. 1992).

Generally, this rule is one of exclusion, but there are exceptions. *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999). The generally recognized exceptions to the rule allow evidence offered to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980). Our standard of review of the trial court's determinations under Rule 404(b) is whether the trial court's ruling was an abuse of discretion. *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Prior to trial, the court considered the arguments of counsel on this issue. Defendant Norman's counsel argued that introducing testimony that Defendant Norman was using cocaine while pregnant would prejudice the jury. Counsel said:

> So I would submit to the Court it's clear no one is going to argue that she wasn't in the home. There were drugs in the home. There were children in the home. But to say she was pregnant and using drugs is not relevant. And it is hugely prejudicial. And I think it's reversible. I mean, I'm just being honest with the Court. I don't think that that's admissible.

The trial court then made the following findings:

> The next issue has to do more with the 404(b). That's clarified under the rules 403. I think the burden is on the defendant to prove that the probative value of evidence is substantially outweighed by the unfair prejudice. I think that there's several different little matters that we need to get into on those things.
>
> The state, in the final analysis, does have the burden of proving its case. So they have to be given some opportunity to do that. This is a matter that has to do with the probative value, the prejudice, and so forth and so on. Let me read over some things. I have some notes down here . . . .

-41-

I think knowledge is an element of the child neglect charge. And her statement or her admission that she knew it wasn't right, that she was taking drugs while she was pregnant, if, in fact, that did come out and it was said, it goes to that issue. It goes to [absence] of mistake, it goes to knowledge, and so forth and so on. And it has to do with her not intending - - at least her knowledge and [absence] of mistake, that exposure, and so forth and so on, it has to do with her not - - not intending and [absence] of mistake that the exposure of drugs and children is being neglectful.

But I think we can have a jury-out hearing on this when we come to it. But I do think that the state has a right to prove the knowledge of however they see fit of this kind of testimony, if she did say this, if she did admit this and it does seem to be credible that [it] could be [] could be coming in under 404(b). We may need to give a limiting instruction. Obviously, for a couple of reasons as to how the jury [is] to consider, also, we may, have a limiting instruction, if it only comes in as to one defendant and not to the other. As you're reminding me, [defense counsel] very well, and it's well said.

When a trial like this is going on, you always have that problem when you've got two defendants. You know, severance might simplify things. But I do think under all of the circumstances, I made my ruling in good faith and set it out in the order. And so I will try as hard as I can to make sure that - - that this evidence comes in the appropriate manner.

At trial, Detective Bruner testified that during the first interview, Defendant Norman denied using drugs. However, she later admitted to using cocaine, marijuana, and ecstasy. Detective Bruner testified that Defendant Norman was pregnant at the time of the interview and near time to deliver. She said that Defendant Norman admitted that she knew it was wrong to use drugs because it might be harmful to the baby. Defendant Norman also cried throughout the interview because she was upset with herself.

The majority of this panel agrees with the trial court that the statement made by Defendant Norman in reference to her pregnancy, and her admission that her drug use while pregnant might be harmful to the baby, was relevant in this case. As part of the child neglect charges against Defendant Norman, the State was required to prove that she "knowingly" abused or neglected a child under eighteen (18) years of age, "so as to adversely affect the child's health and welfare." T.C.A. § 39-15-401(b). Defendant's statement, which was connected to her pregnancy, was relevant to show that she knowingly exposed children to dangerous drugs at the time of the offenses in this case. Defendant Norman's child was born two days after the overdose of Nehemiah Stallings, who tested positive for cocaine, methamphetamine, and ecstasy. Therefore, the trial court properly admitted this evidence.

The author of this opinion notes that Judge Witt is of the opinion the trial court erred, but the error was harmless.

**VI. Failure to Exclude Testimony that Defendant Norman Lied During a Drug Screen Regarding Her Prior Drug Use and a Note Found on the Refrigerator in Defendant Wilson's Apartment**

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under Tennessee Rule of Evidence 402, irrelevant evidence is not admissible. Relevant evidence is generally admissible but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See id.* 402, 403. A trial court's evidentiary ruling based on relevance is reviewed on appeal for an abuse of discretion. *See State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997).

*A. Untruthfulness During a Drug Screen*

Defendant Norman argues that the trial court erred in allowing Danielle Marsh, an employee of Centennial Medical Center, to testify that Defendant Norman lied during a routine drug screen. Ms. Marsh testified that Defendant Norman became a patient at Centennial Medical Center on March 5, 2006. As part of the routine screening procedures at the hospital, Defendant Norman was asked if she used recreational drugs. Defendant Norman denied any recreational drug use; however, when she was confronted " a day or so later," she admitted to using drugs.

Prior to trial, Defendant Norman filed a motion in limine containing the following language:

> The defendant, Tiffany Norman, hereby moves this Honorable Court, pursuant to Rule 801 et seq. of the Tennessee Rules of Evidence, for an Order prohibiting any statements, arguments, testimony or evidence regarding an alleged drug test taken by Tiffany Norman and the results of that test, until the Court has made a determination, outside the presence of the jury, that competent evidence will be presented regarding that testing and that the State will not be relying on inadmissible hearsay. The defendant submits that such a ruling is necessary to prevent undue prejudice against the defendant, in order to protect her right to a fair trial and her right to confrontation as guaranteed under both the Tennessee and United States Constitutions.

WHEREFORE, for the foregoing reasons, the defendant respectfully requests that this Honorable Court grant her motion prohibiting any statements, arguments, testimony or evidence regarding an alleged drug test taken by Tiffany Norman and the results of that test, until the Court has made a determination, outside the presence of the jury, that competent evidence will be presented regarding that testing.

In a pretrial hearing, the trial court heard arguments of counsel concerning the motion. The State argued that results of a positive drug test performed on Defendants Norman and Wilson at Vanderbilt Hospital after the overdose of Nehemiah Stallings was relevant and that both defendants "denied using drugs up until the time when they were questioning [sic] and confronted about those things." Counsel for Defendant Norman argued that the test results were not admissible because there was a problem with the chain of custody and there was no expert witness to testify. The following exchange then took place:

| THE COURT: | Let me try to - - before we get started address this issue we had late in the day. And I've given that a lot of thought in the evening. And you know, I may not make anybody happy around here. But my first reaction about that, you know, about that drug test was that there really wasn't a valid lab report or any chain of custody or any other thing that would make that blood test admissible. So that's pretty much the way I was leaving that. |
| | |
| | And then Mr. Fornash was here. And even though I had made that kind of ruling where I thought that would was pretty much the way the direction the Court was going in. [The prosecutor] wanted to let Mr. Fornash testify and was very insistent about that. And I thought, well, this man has been here all day going back to Auburn in the morning. Out of courtesy, if nothing else, I might have even said that. Let him testify. |
| | |
| | So he testifies. And basically he's saying he went out to the hospital on March the |

-44-

3rd and talked to both defendants and did some sort of presumptive test and got a sample, a urine test. He didn't take the urine. The nurse did. But that it was a positive test. And then he went back in and informed the Detective. I don't know whether it was Detective Bruner or one of the other two or three detectives that handled this case. But I remember her testifying up here. [A]nd I've seen her testify over the years sometimes. So in that - - that point, apparently, both defendants acknowledged that - - that they had been taking drugs. And apparently, the drugs that they were taking were - - one of them, cocaine. And the other one marihuana, methamphetamines, and cocaine.

Then, in the meantime, to use her words, [defense counsel], in trying to be a uniter was the exact words she used decided to say, well, we don't deny that they were on drugs now. And we don't deny that - that at first they denied they were on drugs. And then, at some point for whatever reason, they decided to admit they were on these drugs. And that was going to resolve the whole thing. And I thought that's good, that simplifies that.

But, then [the prosecutor], who is wanting, you know, things the best way he could have them for his point of view, he's trying to say - - and I understood what he was saying all along that it's not so much that [he] wants to introduce the drug test as to whether that was a drug test or not. But the reaction to the information that the women had after the drug test. And that's for the purpose of showing they were lying

or they didn't, you know, they didn't admit it until they were forced to and be confronted with it. They're not, you know, honest women, or whatever it is.

So, on the one hand, I've got a drug test that is not admissible. I've got a man who gave the drug test who told the Detective about the results of the drug test that did probably, common sense being as it is, lead these two women to admit they were using drugs. And I've got an issue whether or not I'm going to mention about a drug test, which I've already said is not admissible, which even the state acknowledged that's [not] admissible.

So my idea on this is and in trying to be fair to both of you. I'm not going to make either of you extremely happy is that as I reviewed early this morning, from what I can understand the way this all developed was that the Detectives were interviewing these women, and during that interview, this guy, Fornash, comes around and after they had denied at first came into the interview and told the detectives, apparently, during the interview that was an otherwise legitimate interview. It was not an interview done involuntarily or just just [sic] Miranda, or anything like that about this test. And they then asked these women, and then they admitted it.

So I would like to do as a sort of a compromise deal and stick with my original ruling that the test shouldn't be gotten into and mentioned because of the fact it's not a valid test in this chain of custody and the reports are not here and this and that and the other is have a

-46-

compromise between and what [defense counsel] wanted to do and what [the prosecutor] wants to do, trying to be fair to both of you. But - - but I do acknowledge what [the prosecutor] is saying about the effect of learning information and I'm not going to be able to ignore that. My decision and thoughts in trying to [be] fair to both of you and not wanting to mislead [defense counsel] is that we could have the witness testifying who I assume is Sarah Bruner. It may not be. But whoever it is testify that they were interviewing these women and that they denied they were using drugs. The defendant doesn't debate that or argue that. But as the interview went on, she received other information concerning the use of drugs without getting into a test that we've already said was not a valid test. It's not admitted. The state doesn't say it should be, but that they received it from another source without getting into what that information was. And then shortly after that, they admitted they were taking drugs.

That's, I think, the fairest way I can do this, and therefore, I'm not mentioning a drug test, but I am allowing something to have to developed that would change the mind without doing something that's not valid.

[Defendant Norman's Counsel]: On behalf of Ms. Norman I have no objection to that, Your Honor.

THE COURT: Can you live with that?

[Prosecutor]: That's fine.

[Defendant Norman's Counsel]: We can live with that.

-47-

After agreeing that her denial of using drugs could be admitted during testimony about her interview with detectives at Vanderbilt Hospital, Defendant Norman objected to that same testimony by Ms. Marsh when she was admitted to Centennial Hospital for the birth of her child. Prior to Ms. Marsh's testimony, counsel for Defendant Norman made an objection and the following exchange took place:

[Defendant Norman's Counsel]: So I have a couple of objections. First of all, her pregnancy had already been admitted. There's no reason to beat it into the ground. Second of all, the fact that she tested positive days after the child was injured is completely irrelevant to those counts. And third of all, the social worker is a lab - - we're back to the whole lab issues with a drug screen. I don't [think] she's qualified to testify about it. We're right back to that drug screen.

[Prosecutor]: My response is first of all, she's not going to testify about the lab results. I've already advised her that the courts may rule regarding that even though the lab testing was done in a hospital [l]aboratory and is confirmatory. The basis for her testimony is - - is that she's not going to testify about that. The basis for her testimony is that Ms. Norman came in on the 5th of March as part of the preliminary screen for her hospitalization. She's asked a series of routine questions about whether she's involved in recreational drug use . . . Ms. Norman denied using drugs. And later when confronted by Ms. Marsh admitted that she did, in fact, use drugs. So the basis is it put in the defendant's denial of using drugs and then later admitting it, which is, again - -

THE COURT: Similar to the other.

[Prosecutor]: Exactly.

| | |
|---|---|
| [Defendant Norman's Counsel]: | Except that with the other witness it was in the time frame of the child's injury. This is after the child's injury. |
| [Prosecutor]: | Three days. |
| THE COURT: | In other words, (cannot hear). [sic] |
| [Defendant Norman's Counsel]: | Your Honor, I am objecting to it. I stated at the time but I am asking if the state is intending to [introduce] the fact that she came into the hospital to give birth. Are we going to beat the pregnancy[?] |
| [Prosecutor]: | Well, the screening procedure is part of that process, but I don't need to [elicit] that information. |
| THE COURT: | You won't do that. |
| [Prosecutor]: | No. (Can't hear) [sic]. |
| [Prosecutor]: | Yes, I'll be very specific on my questions. Yes. |
| [Defendant Norman's Counsel]: | Just note my objection. I know. |

Initially, we note that Defendant Norman did not make any specific objection to testimony that she lied during the drug screen at Centennial Hospital in her motion in limine or during trial. She made no contemporaneous objection to any specific testimony given by Ms. Marsh. Therefore, this issue is waived pursuant to Tennessee Rule of Evidence 103 and Tennessee Rule of Appellate Procedure 36(b).

Even if the trial court's admission of this evidence was error, we find that it was harmless error. The jury had already heard testimony that Defendant Norman had lied to detectives when she was interviewed at Vanderbilt Hospital after the overdose of Nehemiah Stallings by telling them that she had not used drugs. However, she later admitted to using recreational drugs. Defendant Norman did not object to this testimony, and in a jury-out hearing told the trial court that she could "live" with it. Defendant Norman is not entitled to relief on this issue.

*B. Note Found on the Refrigerator*

Defendant Wilson argues that the trial court erred in admitting a note found on the refrigerator of her apartment at 28 Shepard Street which was seized by police during a search of the residence on July 12, 2006, that read:

> Give Me, Me Befor[e] You Come in As of Today the 1st of July, 2006, anyone who sells out of my house on my property is paying me $50 daily. [I]f you CAN'T Do That, don't Bring your shit on my property. And that's - that- on-that. After 12 a.m., No More Serving. What I said!!

The note was signed "DA" which was crossed out.

> Prior to trial, Defendant Wilson filed a motion in limine for an order by the trial court

> [t]o prevent mention or reference to a note alleged to have [been] found on the refrigerator of the home of the Defendant [Wilson], and others, on or about the 12th day of July, 2006. The note is not signed by anyone, [n]or is there any mention of drugs or narcotics within the note, nor has the State tendered a witness that will testify that the handwriting on the note is that of the Defendant's.

Concerning this issue, the trial court considered counsel's arguments and said:

> . . . I understand what you're saying, [defense counsel], but, in the Court's opinion, this is relevant circumstantial evidence about what was going on in that house that is your client's house. I recognize and accept that there's a number of people coming and going out of this house. I recognize that she was not present at the time that the search warrant was apparently served. And I also recognize that this note - note could refer to a number of things. It could be related to selling sandwiches or popsicles or whatever else it may be going on.

> But I think, clearly, it will be a question for the jury to consider. And it's something that you can argue. I think it goes to the weight, but I do think it's relevant under the circumstances of this case. And it is relevant circumstantial evidence.

The record supports the trial court's decision to admit the note. It was relevant to show that Defendant Wilson knowingly allowed drug activity to take place in her residence and that she knowingly exposed small children to the danger of drugs being sold there. As

pointed out by the State, the jury could reasonably infer that Defendant Wilson wrote the note found on her refrigerator and that the note addressed the sale of drugs. Defendant Wilson is not entitled to relief on this issue.

## VII. Admission of Expert Testimony by Dr. Donna Seger

Defendants Wilson and Norman argue that the trial court erred in allowing Dr. Donna Seger to testify concerning the time that Nehemiah Stallings ingested the drugs. They contend that the scientific basis for the testimony was not properly established.

Questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263–264 (Tenn. 1997). Pursuant to Rule 702 of the Tennessee Rules of Evidence, an expert may testify "in the form of an opinion or otherwise," when the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Rule 703 of the Tennessee Rules of Evidence requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens,* 78 S.W.3d 817, 834 (Tenn. 2002). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. *Id.* at 832.

Concerning this issue, the trial court found:

The Court is of the opinion that the proposed testimony of Dr. Seger in this case would substantially assist the trier of fact to understand the nature and the time frame regarding issues that brought the victim to the hospital and the accompanying seizures. The Court finds that Dr. Seger is qualified to describe to the jury her observations and conclusions regarding when the victim ingested the substance in question, as well as other related medical analyses and conclusions. The Court finds that Dr. Seger's testimony would be reliable, based not only on her training and experience, but also on her reliance on numerous articles and studies published which have been reviewed by members of the medical community and widely accepted in the profession. Finally, the Court finds that Dr. Seger has been qualified as an expert witness in the Courts of this state in her field of medical toxicology on numerous occasions and will be allowed to testify in this case as to her findings.

The record supports the trial court's findings.

In a pre-trial hearing, Dr. Sheila Dawling, who was a biochemist and pharmacologist and Director of the Toxicology Lab at Vanderbilt Medical Center, testified first concerning two urine samples that were received for analysis concerning Nehemiah Stallings. The samples were positive for cocaine, methamphetamine, and ecstasy. Concerning the time frame that the drugs were ingested, Dr. Dawling said:

> We - - we usually say that amphetamines and cocaine can be detected in urine between one to four or five days after exposure. More typically for amphetamines, it's more like two to three days because they metabolize more quickly than cocaine. But it does depend on the dose that's been injected [sic]. And obviously, the larger the dose that has been ingested, the longer it's going to hang around for.

Concerning the time frame specifically related to Nehemiah's case, she testified:

> The only thing of note is that when you look at the relative concentrations of the parent drug and the metabolite, there's much, much more parent drug present than metabolite. However, when you look at the second sample, the ratios are not - - not that different. So, you know, you normally would say, well, if you see much more metabolite than parent compound, it indicates that there has been a longer time lapse between the ingestion and the provision of the sample. But that's much more true if you're looking at blood. When you're looking at urine, of course, you've got the relative solubility of the - - the different compounds in the urine to think about. And some things as soon as they're made, they're excreted, whereas [ ] other things are not very well excreted. So, you know, just as a guideline I would say that it wouldn't look like it's a very old ingestion, but it really wouldn't be that scientific, you know, to - - to actually state categorically that these represent samples after recent ingestion. And obviously, the longer the time lapse between ingestion and [excretion] of the sample the lower the concentration should be overall. And so, you know, looking at these results that I have here, and if somebody said to me, oh, these samples are forty-eight hours after exposure, my reaction would be, gosh, they must contain an awful lot of something forty-eight (48) hours ago to still have this size of drug present now.

On cross-examination, Dr. Dawling testified that she did not have a medical degree. She testified that there was no scientifically acceptable, reliable way to determine when the drugs were ingested by Nehemiah. She said that everyone's metabolism is different, and there are no double blind studies on infants with cocaine to determine how fast it metabolizes. Scientifically, Dr. Dawling felt that the range of ingestion was between a few hours and three days. On re-direct examination, the following exchange took place:

| [Prosecutor]: | And lastly, I think - - you were answering some questions that [defense counsel] asked you about whether there was any scientific way of determining when these drugs were ingested. And I think your response was no. You're talking, specifically, about basing your opinions solely on the urine results, correct? |
|---|---|
| [Dr. Dawling]: | Yes. |
| [Prosecutor]: | All right. So you're not saying that somebody else couldn't offer opinions about when the drugs were taken relative to when symptoms appear? |
| [Dr. Dawling]: | Oh, no. That [sic] perfectly reasonable to do that. |

Dr. Donna Seger testified that she was a medical toxicologist and Medical Director of the Tennessee Poison Center. She was also an Associate Professor of Medicine and Emergency Medicine at Vanderbilt and an expert in the field of toxicology. Dr. Seger testified that she reviewed portions of the medical records of Nehemiah Stallings and the lab results provided by Dr. Dawling. She said that the level of cocaine in Nehemiah's urine was a "very high level." The following exchange then took place:

| [Dr. Seger]: | Cocaine doesn't stay around in the urine for a long period of time, as you can see over that five hours how it rapidly decreased. So that means that the ingestion had to have occurred very shortly before the time of admission. |
|---|---|
| [Prosecutor]: | And on what do you base that opinion? |
| [Dr. Seger]: | Well, as I said, the level is very high. You know, you can't have that high a level and not have - - one would expect to see consequences of that high of a level. I mean, you just wouldn't be walking around with a level of one thousand ten. |
| [Prosecutor]: | And what types of consequences would you be referring to, Doctor? |
| [Dr. Seger]: | It could either be seizures, in the either central nervous such as seizures. Or you could potentially have cardiac |

-53-

complications from it, but I would expect one of those two.

[Prosecutor]: Are you familiar with the reports of the Emergency Room physicians describing Nehemiah's condition when he appeared at admission at twelve-thirty a.m.?

[Dr. Seger]: Yes, he was in status. He was having constant seizures that were difficult to stop.

[Prosecutor]: And are those seizures, those symptoms consistent with the levels of cocaine that were ultimately discovered two and a half hours later?

[Dr. Seger]: Yes.

[Prosecutor]: Would you expect that Nehemiah would have been capable of having those levels for any prolonged period of time before he began displaying those kinds of seizure-like activities?

[Dr. Seger]: No.

[Prosecutor]: How long - - assuming that Nehemiah was not smoking cocaine or intravenously ingesting it, if he were to take it orally, how long would it take for those - - for that cocaine to be ingested into his system and have an effect on his central nervous system?

[Objection by Counsel for Defendant Norman]

* * *

[Dr. Seger]: Well, cocaine is fairly rapidly absorbed so it would be absorbed into the system within thirty minutes to an hour, depending somewhat on how much food is in the stomach. If there's a lot of food in the stomach the absorption could be somewhat delayed. I mean, so I guess if I was pushed I might say two hours but my opinion would be probably within an hour.

-54-

| | |
|---|---|
| [Prosecutor]: | And given the levels of - - how does the level of cocaine that he had at three o'clock influence that decision? |
| [Dr. Seger]: | Well, it's difficult to make a decision based on that because you don't know how much cocaine has continued to be absorbed. What that tells you is that the cocaine is being metabolized and - - by the liver, and therefore the level is going down. And that's simply all that tells you. |
| [Prosecutor]: | Doctor, would you expect Nehemiah to be able to engage in normal child activities such as eating, drinking, appearing alert, if he had ingested this cocaine within an hour's time frame of engaging in those activities? |
| [Dr. Seger]: | You mean within the hour after he ingested it? |
| [Prosecutor]: | Yes. |
| [Dr. Seger]: | No. |
| [Prosecutor]: | So if there was a history provided that sometime after eight p.m., on the evening before admission, that is March 2nd of 2006, that Nehemiah had been eating, drinking, taking a bath, appearing normal, not displaying any symptoms, would it be your opinion that the ingestion of this cocaine, at least, would have had to have taken place sometime after that? |
| [Dr. Seger]: | The ingestion had to occur shortly before he was admitted to the hospital. |

Dr. Seger also testified the "methamphetamine would have had to have been within twenty-four hours."

On cross-examination, Dr. Seger explained that Dr. Dawling had a lot of experience in Analytical Toxicology, but not Medical Toxicology which are two different fields. She felt that Dr. Dawling was looking at the time of ingestion from an analytical point. Dr. Seger testified:

And as I said, you know you can have a positive cocaine screen for up to three days following ingestion. You can have a positive marijuana screen for thirty days. The issue is how that correlates clinically, which is not what she does. She looks at the testing and verifies whether the testing is accurate. I certainly agree with those statements.

However, in this case, with the levels such as this child had, this did not occur three days earlier. She's talking about screening in general. And I agree with that.

Dr. Seger further testified:

I think that's her perspective from an Analytic[al] Toxicologist who does not take care of patients. And that would be exactly what I would expect an Analytical Toxicologist to say because she doesn't want to take responsibility for what the clinical consequences are at the lab.

I completely agree with what she said and that is not in disagreement to what I'm saying.

Analytically what she's saying is you can have positive screens within a number of days from that time. You have a seizing child that has had all other aspects of seizures worked out. There was no other cause of the seizures. And that's very important. For instance, if he had a brain tumor one would say the brain tumor caused the seizures but the cocaine potentiated it. But you wouldn't say it was the cocaine that caused the seizures.

And that's why she's qualifying it. She's saying that when drugs are quantitated you can't make clinical correlations simply from looking at that drug screen.

I take the next step. I'm the clinician, I look at the patient. I say this child had seizures. He was completely worked up, he didn't have meningitis, he didn't have something in his head, he didn't have electrolyte abnormalities.

So the diagnosis of seizures from drugs is always a diagnosis of exclusion. All of the other categories were excluded and he ends up with a high concentration of cocaine. That means his seizures were caused by drugs.

So I think what you're doing is confusing what an Analytic[al] Toxicologist says, who looks at the lab and the drug screens, from what a Medical Toxicologist says who takes care of patients.

When asked if there had been any studies in that age group on which to base her opinion, Dr. Seger testified that there had "been a number of GI contamination studies that were done" of which she was one of the authors. She said:

Because exactly of questions like that, the group of European and American Toxicologists conferred a conference and looked at [GI] contamination to determine whether or not it would be important to try and empty the stomach when people come to the emergency department, so they had to look at absorption.

So it was all age groups that were used, from very, very small to old people to look at the time frame in which it's absorbed.

There's not a huge difference in absorption between children and adults. Children are a bit quicker than adults. So I mean if it would be anything it would be more likely to be less, just because they absorb things quicker into the brain and into the stomach and things like that.

And that's where that data comes from. And those were position statements that were written in Clinical Toxicology in 1997, and reaffirmed in 2004.

Dr. Seger further referenced absorptions studies done with therapeutic drugs such as Tylenol, and she noted that in Europe there were "some studies in which people ingested different drugs so they could use them in absorption studies we looked at." When asked about the science backing her opinion, Dr. Seger testified:

[Dr. Seger]: So the absorption - - there's been - - there's lots and lots of absorption studies that have been done with the therapeutic drugs in terms of looking at when you give somebody a Tylenol or when you give somebody - - you see people that - - there actually were in Europe some studies in which people ingested different drugs so they could use them in absorption studies we looked at.

-57-

|  | So there were lots and lots of absorption studies that document how long it takes for drugs to be absorbed. |
|---|---|
|  | As I said, the [   ] drugs that are a problem with this is sustained release and these aren't them. There's a great deal of science that looks at absorption. |
| [Defendant Norman's Counsel]: | Absorption of these drugs, I'm talking about. |
| [Dr. Seger]: | And I'm talking about, yes. |
| [Defendant Norman's Counsel]: | Cocaine, ecstasy, and methamphetamine? |
| [Dr. Seger]: | Absolutely. |
| [Defendant Norman's Counsel]: | All right, what studies address that issue? |
| [Dr. Seger]: | There aren't studies, they're looking at volunteers who would take these drugs and then you look at areas under the curve. So you look at what their peak concentration is and how long it takes them to go down. |
|  | So let's say that you have a person that comes in that has ingested these drugs and you get levels every two hours, you can look at those levels every two hours and determine how long it took for that drug to be metabolized. |

And then you go back to what time they ingested it and you can once again tell how long it took for that to be metabolized.

Based on the foregoing, the trial court properly found Dr. Seger's testimony to be reliable and admissable. As pointed out by the State, Dr. Seger's testimony was supported by scientific evidence and peer review and publication. The basis for her opinion was

generally accepted in the scientific community and her research had been conducted independent of the litigation in the present case. Moreover, Defendants Wilson and Norman did not present any evidence to refute Dr. Seger's testimony. Defendants are not entitled to relief on this issue.

## VIII. Sentencing

*Length of Sentence*

Defendant Wilson contends that the sentence imposed by the trial court is excessive. She complains that she was entitled to mitigation because she "played a minor role in [C]ounts 1 through 4 and Counts 6 and 7" and that "[t]he trial court erred in sentencing [her] to more than the minimum sentences in Counts One through Six and Count Nine." She does not challenge the sentence as to counts eight, ten, and eleven. Defendant Wilson further argues that the trial court erred in ordering her seventeen-year sentence in count one, her ten-year sentence in count four, and her ten-year sentence in count six be served consecutively for an effective thirty-seven-year sentence.

As a Range I, standard offender, Defendant Wilson was subject to a sentence range of between fifteen and twenty-five years for aggravated child neglect in count one; between three and six years for conspiracy to possess a Schedule II controlled substance with intent to sell in count three; between eight and twelve years for possession of .5 grams or more of cocaine with intent to sell in counts four and eight; between eight and twelve years for attempted aggravated child neglect in count six; and between three and six years for tampering with evidence in count nine. T.C.A. § 40-35-112(a). The applicable punishment for misdemeanor reckless endangerment in count seven, resisting arrest in count ten, and possession of drug paraphernalia in count eleven was a sentence up to eleven months, twenty-nine days.

The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior; and Defendant was on probation at the time of the offenses in this case. T.C.A. § 40-35-114(1), (13). The trial court also found two mitigating factors: Defendant's criminal conduct neither caused nor threatened serious bodily injury (counts nine, ten, and eleven only); and Defendant has "attempted to rehabilitate herself with respect to her drug addictions while in custody." T.C.A. § 40-35-113 (1), (13).

Based on the presence of the enhancement and mitigating factors, the trial court sentenced Defendant, as a Range One, standard offender, to seventeen years for aggravated child neglect (count one); five years for conspiracy to possess a Schedule II controlled substance with intent to sell (count three); ten years for each conviction of possession of .5

grams or more of cocaine with intent to sell (counts four and eight); ten years for attempted aggravated child neglect (count six); and five years for tampering with evidence (count nine). Defendant Wilson was also sentenced to eleven months and twenty-nine days for the misdemeanor reckless endangerment conviction in count seven, six months for resisting arrest in count ten, and eleven months, twenty-nine days for possession of drug paraphernalia in count eleven.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett,* 49 S.W.3d 250, 257 (Tenn. 2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn.1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo. Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992)).

*Enhancement and Mitigating Factors*

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about

sentencing.  T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id.* at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

Misdemeanor sentencing is controlled by Tennessee Code Annotated section 40-35-302, which provides, in part, that the trial court shall impose a specific sentence that is consistent with the purposes and principles of the 1989 Sentencing Reform Act. *See* T .C.A. § 40-35-302(b).  A separate sentencing hearing is not required in misdemeanor sentencing, but the trial court must "allow the parties a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." T.C.A. § 40-35-302(a). A misdemeanor sentence, unlike a felony sentence, has no sentence range.  *State v. Baker,* 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997).

The trial court is allowed greater flexibility in setting misdemeanor sentences than felony sentences. *State v. Johnson,* 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999).  The trial court, however, must impose a specific sentence for a misdemeanor conviction consistent

with the purposes and principles of the 1989 Criminal Sentencing Reform Act. T.C.A. § 40-35-302(d); *State v. Palmer,* 902 S.W.2d 391, 394 (Tenn. 1995). The trial court should consider enhancement and mitigating factors in making its sentencing determinations; however, unlike the felony sentencing statute, which requires the trial court to place its findings on the record, the misdemeanor sentencing statute "merely requires a trial judge to consider enhancement and mitigating factors when calculating the percentage of a misdemeanor sentence to be served in confinement." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998).

The record reflects that the trial court considered the evidence presented at trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment.

Defendant Wilson contends that the trial court erred in failing to find as a mitigating factor that she played a minor role in counts, one, three, four, six, and seven. Concerning this issue, the trial court held:

> The Defendant [Wilson] contends that she was convicted of these counts largely because she was the primary resident of the home in which these incidents occurred. The Court finds that the Defendant has not effectively demonstrated that she played a minor role in these offenses. The Court finds that the Defendant [Wilson] was convicted as a principal in each count; therefore, the jury found her responsible for the crime. The Court is therefore of the opinion, by a preponderance of the evidence, that this mitigating factor does not apply to any of Defendant's [Wilson] convictions.

The record supports the trial court's findings. As pointed out by the State, Defendant Wilson was responsible for the care and well being of Nehemiah Stallings at the time of his overdose on cocaine, ecstasy, and methamphetamine. She was the leaseholder of the apartment where she sold and possessed drugs, and she allowed others to possess and sell drugs as evidenced by the trial testimony and a note found on her refrigerator. Defendant Wilson also played more than a minor role in allowing Mych'Keira Stallings and Antoine Batey to be exposed to the drug activity in her home.

In considering the enhancement factors, the trial court noted:

> [B]ased on the evidence submitted at the hearing, the Defendant [Wilson] has sustained one felony conviction for eight years for Possession of Cocaine for Sale on August 18, 1998, and seven misdemeanor convictions, including a

-62-

conviction for Assault on December 3, 2002; a conviction for Driving With a Suspended License on September 22, 1998; a conviction for Resisting a Stop on August 10, 1998; a conviction for a traffic offense on October 2, 1997, two convictions for Resisting a Stop on March 18, 1997, and a conviction for Disorderly conduct on March 4, 1997. The Court finds that the Defendant's criminal record commenced at age twenty-four and continued until her arrest at age thirty-four in the instant case. The Court therefore is of the opinion, by a preponderance of the evidence, that § 40-35-114(1) is applicable to all counts against the Defendant.

The presentence report also contains comments concerning Defendant Wilson's drug use:

The defendant stated that she has used non-prescribed and illegal drugs in the past. She reported using cocaine and ecstasy. Her first reported use of cocaine was at age 31. She stated that she used the drug occasionally until age 34.

The defendant reported her first use of ecstasy was at age 33. She stated that she used the drug on occasion until age 34.

The trial court noted that Defendant Wilson was on probation at the time of the offenses. The presentence report indicated that she was sentenced to eight years for possession of cocaine in August of 1998, and she was still on probation for that offense when the present offenses were committed in 2006.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of seventeen years for aggravated child neglect (count one); five years for conspiracy to possess a Schedule II controlled substance with intent to sell (count three); ten years for each conviction of possession of .5 grams or more of cocaine with intent to sell (counts four and eight); ten years for attempted aggravated child neglect (count six); eleven months, twenty-nine days for reckless endangerment (count seven); five years for tampering with evidence (count nine); six months for resisting arrest (count ten); and eleven months, twenty-nine days for possession of drug paraphernalia (count eleven). Defendant Wilson is not entitled to relief on this issue. We also note that the judgment form in count eight reflects that Defendant Wilson was convicted of possession of .5 grams or more of cocaine with intent to deliver; however, the verdict reflects that she was convicted of possession of .5 grams or more of cocaine with intent to sell. Therefore, we remand for entry of a corrected judgment form in count eight to reflect

the verdict.

*Consecutive Sentencing*

Defendant Wilson contends that the trial court erred in ordering several of her sentences to be served consecutively. A trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence that any of the following factors are applicable:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b); *See also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The length of the sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. §§ 40-35-102(1)-103(2). Whether sentences are to be served concurrently or consecutively is a matter

addressed to the sound discretion of the trial court. *State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999).

In this case, the trial court found that consecutive sentencing was appropriate based on a finding that Defendant Wilson was an offender whose record of criminal activity is extensive. Defendant Wilson's criminal record consisted of one felony conviction and seven misdemeanor convictions. The court also noted that Defendant Wilson "was on probation for the Possession of Cocaine for Sale at the time of her offenses in this case." The presence of a single factor is sufficient to justify the imposition of consecutive sentences. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Additionally, the trial court found that the sentence was necessary to protect society and was "the least severe measure necessary to appropriately punish the Defendant for the offenses committed." Defendant Wilson is not entitled to relief on this issue.

## CONCLUSION

After a careful review, we reverse and dismiss Defendant Norman's convictions for child neglect in counts one and two, which were merged by the trial court. We also remand for entry of a corrected judgement in count eight to reflect Defendant Wilson's conviction for possession of .5 grams or more of cocaine with intent to sell rather than deliver. Otherwise, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE